MaddeN, Judge,
delivered the opinion of the court:
The plaintiff sues for $166,911.33 which, it claims, is the amount which it expended above the amount which it was paid for the manufacture, for the Government, of shell fuzes. By order of the court, the instant phase of .the suit is limited to the question of liability, leaving, to further proceedings the amount which the plaintiff may recover, if the Government is liable.
The plaintiff corporation’s principal place of business is at Union, New Jersey. Its principal business is the manufacture of a self-locking nut,.known as the “elastic stop nut.” It has a factory at Union, and another one at Lincoln, Nebraska. Until the middle of 1944 its factories and facilities were engaged in the manufacture of these nuts, principally for airplane manufacturers and for the Army and the Navy. In the summer of 1944 orders for the elastic stop nuts decreased and the plaintiff sought contracts with the Government for the manufacture of other things. It was given a contract, No. 1932, for the manufacture of 1,011,000 shell fuzes, at the unit price of $1.58 each, to be manufactured at its New Jersey plant, under the supervision of the Army’s New York Ordnance District. At the same time it was given another contract, No. 828, for the same number of fuzes at the same price at its Lincoln, Nebraska, plant. The instant claim arises out of Contract No. .1932.
Article. 33 of the contract, which is set out verbatim in the findings, stated that the parties recognized that the unit price of $1.58 set in the contract might turn out, upon experience, to be too high or too low,' and that they therefore agreed to *103 revise the price in the light of actual experience in the manufacture of the first 40% of the total number of fuzes, which they called the “trial run.” The contractor was to keep a careful record of its costs and furnish to the Government within 30 days after the completion of the trial run its data and its proposal for a revised price. The parties were, thereupon, to negotiate in good faith and attempt to .reach an agreement upon a revised price. If they could not agree, either party might then terminate the contract, and in that case the provisions of Article 12, “Termination at the Option of the Government” were to apply, except that the contractor was to be allowed no profit on the uncompleted portion of the contract. Article 12 provided, in substance, that the contractor should, upon termination, be reimbursed for its costs.
: After the execution of Contract No. 1932, the plaintiff acquired the necessary machinery and tools for its performance, and began the manufacture of fuzes at its New Jersey plant and did the same, under Contract No. 828 at its Nebraska plant. By December 1944, it had learned that it could manufacture the fuzes more efficiently and at lower cost at its Nebraska plant. Besides, the demand for elastic stop nuts had revived, and practically all of these were being made at the New Jersey plant. The plaintiff after discussions with representatives of the Ordnance Department, made a written request on January 1,1945, for permission to manufacture the fuzes under Contract No. 1932 at its Nebraska plant. The request was granted. The plaintiff was notified on January 11 that Contract No. 1932 had been transferred for administration from the New York to the St. Louis Ordnance District. The St. Louis District was directed to administer the contract from the date of transfer “including any price redetermination under Article 33 * * The plaintiff had already, pursuant to the preliminary discussions, shipped machinery from New Jersey to Nebraska.
Before the contract was transferred, a number of change orders concerning Contract No. 1932 had been issued but the amounts due the plaintiff under them and other details had not been worked out. The St. Louis District said that it *104 would be confusing to administer these matters from the St. Louis office, when the data concerning them were in the New York District. The St. Louis District suggested that Contract No. 1982 be returned to the New York District, and be there terminated at a quantity of fuzes which would use up the parts in process, and that a new contract be made by the St. Louis District for the production of the uncompleted balance of the fuzes, they to be manufactured at the Nebraska plant. A meeting of the parties took place in Washington, D. C., and the problem was discussed. The plaintiff’s representative at the meeting inquired whether the plaintiff would lose its rights under Contract No. 1932 if the suggested procedure was followed. It was agreed by all present that the rights and obligations of the parties would be the same as they would have been if the transfer of Contract No. -1932 to St. Louis had not been rescinded. The plaintiff thereupon agreed to the suggested procedure.
' After negotiations with the plaintiff, the St. Louis Ordnance District issued a “letter order” designated as Contract No. 1523, dated January 31, 1945, for 2,429,000 fuzes, subsequently reduced to 1,001,600 fuzes, at prices to be sube-quently agreed on. At the same time a change order was issued accelerating the production of the fuzes then being manufactured at the Nebraska plant under Contract No. 828.
On February 21, 1945, the plaintiff wrote the New York Ordnance District as follows:
* * * we are willing to accept cancellation of Contract No. * * * 1932 contingent upon February production and delivered and accepted fuzes. The remaining undelivered quantity upon which we accept cancellation is 931,000 pieces.
This cancellation will be accepted without termination charge with the complete understanding that all other provisions as outline in Contract No. * * * 1932 remain in full effect.
On February 22, the New York Ordnance District sent to the plaintiff a notice of the partial termination, for the convenience of the Government, of Contract No. 1932, which said that the contract was terminated as to all but 80,000 fuzes, and was further terminated as to any of the 80,000 *105 fuzes .not completed on February 28. The notice contained a paragraph 6 (b)- which said:
❖ * ❖ . ❖ # •
(b) If you wish to waive any termination claim against the Government, please sign and return all three . copies of the inclosed “No-Cost” Prime Contract Settle- . ment Agreement. One copy signed by the Contracting Officer will be returned for your files.
The notice of termination was accompanied by a form of document entitled “Acknowledgment of Notice and Intent To File or Not To File a Claim”, and by a draft of a proposed “Supplemental Agreement No. 5 to Contract * * * 1932.” The draft said, inter alia:
. % ❖ * ❖ *
.WhbReas, the Contractor is willing to waive unconditionally any claim against the Government by reason of such termination; and
Whereas, such unconditional waiver by the Contractor will expedite settlement of the Contract and will ■otherwise promote the objectives of the Contract Settlement Act of 1944.
Now, therefore, the parties hereto agree a,s follows:
Article 1. The Contractor hereby unconditionally waives any claim against the Government arising under the terminated portion of the Contract or by reason of its termination including, without limitation, all obligations of the Government to make further payments or tp carry out other undertakings in connection with said terminated portion, and the Government hereby unconditionally releases the Contractor from any obligation to perform further work or services or to make further deliveries of articles or materials under the terminated portion of the Contract; provided however, that nothing herein contained shall impair or affect in any way any other covenants, .terms, or conditions of the Contract.
. Uppn receiving the proposed agreement the plaintiff’s representative was in doubt as to whether it reserved the plaintiff’s rights to file claims arising out of the unterminated portion of the contract calling for 80,000 fuzes. He telephoned Mr. Ferguson, the Government’s Chief of Terminations, asking him what the proposed Supplemental Agreement meant in that regard. Mr. Ferguson told him that the proviso at the end of the language quoted above reserved the *106 plaintiff’s rights arising nnder the uncanceled portions of the contract. The plaintiff thereupon signed the Supplemental Agreement and the waiver of a termination claim. It continued to manufacture fuzes until February 28 by. which date it had completed 54,250 fuzes.
On August 2,1945, the plaintiff filed a claim with the New York Ordnance District for its costs in executing Contract No. 1932 up to the point of its termination, less the $1.58 per fuze which it had been paid for the 54,250 fuzes completed. The claim was rejected by the contracting officer on the ground that the Supplemental Agreement which the plaintiff had executed constituted a no-cost settlement agreement. Nevertheless the Government caused its auditors to make an accounting review of the plaintiff’s claim, and their audit showed that the plaintiff’s costs exceeded by $231,493.90 what it had been paid. Though these costs were incurred at the New Jersey plant, the Government’s auditors allocated them between Contract No. 1932 and Contract No. 828, the contract which was to be performed at the Nebraska plant, and the Government paid the plaintiff $64,582.57, the amount which its auditors allocated to Contract No. 828. The Board of Awards of the St. Louis Ordnance District said, of the amount so allocated to Contract No. 828:
These costs represent “starting load” and manufacturing costs allocable to components manufactured at the Union, New Jersey, plant and shipped to Lincoln, Nebr., for use in the performance of Contract * * * 828.
The plaintiff, in addition to the 54,250 fuzes which it had completed in New Jersey, had manufactured parts of fuzes there which it had shipped to its Nebraska plant where they were incorporated in completed fuzes. Those parts were the basis of the allocation made by the Government’s auditors. The same type of starting load costs were found by the auditors to be applicable to the 54,250 fuzes completed at the New Jersey plant, but the St. Louis officials could not pay those costs because they never came, even colorably, within their jurisdiction.
The plaintiff’s claim having been denied by the New York Ordnance District, the plaintiff appealed to the Appeal Board, Office of Contract Settlement. The Appeal Board *107 -decided that the plaintiff had not, by the Supplemental Agreement, waived the rights which it would have had if Contract No. 1982 had been shifted to the Nebraska plant, instead of being terminated'.: Therefore, the plaintiff was •entitled, assuming that it was not in default, to the benefits -of Article 12 of the contract. But, the Board held, under Article 12 the contractor has no right, which the Board could ■enforce, to a price revision: It held that a price revision, in that situation, lay entirely in the discretion of the contracting agency.
We think that the Board overlooked, or failed to see the ■significance of Article 12 (f) of Contract No. 1932. It says, in regard to termination of the, contract by the Government^ which occurred in the instant case:
* # # # ❖
(f) In the event that, prior' to the determination of the final amount to bepáid to the Contractor as in this Article provided, the Contractor shall file with the Contracting Officer a request in writing that an equitable adjustment should be made in the price or prices specified in the contract for the work not terminated by the Notice of Termination th¿ appropriate fair and reasonable adjustment shall be made in such price or prices.
* * ' ' * * *
We think that the contractor was entitled to such an adjustment as of right, and was. not merely dependent upon the grace of the contracting officer as to whether he should receive it or not. The other provisions of Article 12 furnish a sufficient guide as to the basis for such an adjustment, so that a court is not merely acting at large in making the adjustment when the contracting officer has refused or neglected to make it. The Government’s own auditors seem to have had no difficulty in determining the- elements to be considered. Those elements are, as we understand them, the costs, computed by proper accounting methods, and reasonably incurred. The plaintiff is claiming no profit.
The documents out of which the plaintiff’s rights must be .culled are verbose and complicated Government writings. It was not remarkable that the plaintiff’s representative asked the Government’s Chief of. Terminations what they meant, and relied upon his answer.’ That answer was in accord with *108 what had been agreed upon in the discussions which preceded the reduction of the supplemental agreement to writing. There was no reason why the plaintiff would have been willing, or why the Government would have wanted the plaintiff, to give up valuable rights upon entering into an arrangement made only for convenience of administration. If, therefore, the supplemental agreement will not bear the interpretation which, the Government’s Director of Terminations placed upon it, the plaintiff is entitled to have it reformed to express what was clearly the intent of the parties. Since the same result follows whether we interpret the contract according to the intent of the parties, or reform it to express that intent, we do not explore the question further.
The plaintiff’s other contracts, Nos. 828 and 1528, performable at the Nebraska plant, were terminated, and the St. Louis District made settlement satisfactory to the plaintiff. As we have said, a part of the starting costs incurred at the New Jersey plant in the preparation for performance of Contract No. 1932 were attributed by the Government to the Nebraska contract, No. 828, and the plaintiff was paid $64,582.57 on that account in the settlement of that contract. The Government raises the question whether if the plaintiff were to be paid what it claims to be the balance of its starting costs at the New Jersey plant, that would be a double payment. It would seem that it would not be, but that question will be resolved by the evidence to be taken as to the amount of the recovery.
The Government questions the accuracy of the account prepared by its auditors, hence further proceedings must be had before a commissioner of this court as to the amount to which the plaintiff is entitled. Our present determination is only that the Government is liable to the plaintiff.
It is so ordered.
Howell, Judge; Whitak.ee, Judge; Littleton, Judge; and Jones, Ohief Judge, concur.
FINDINGS OF FACT
The court having considered the evidence, the report of Commissioner Wilson Cowen, and the briefs and arguments of counsel, makes the findings of fact as follows:
*109 1. Plaintiff is and at all times pertinent to this action was a domestic corporation, organized in 1934 under the laws of the State of New Jersey, and having its principal place of business at Union, New Jersey.
2. On or about September 27,1944, plaintiff and defendant entered into a written contract, No. W-30-069-QRD-1932, hereinafter referred to as Contract No, 1932, whereby the plaintiff agreed to furnish and deliver to defendant 1,011,000 fuzes at the unit price of $1.58 (subject to certain repricing provisions), or for a total of $1,597,380.00 at such unit price. A copy of the contract, including various supplements thereto, was received in evidence as Plaintiff’s Exhibit No. 1 and is incorporated herein by reference.
Article 33 of the contract, which was entitled “Revision of Entire Price by Negotiation” provided in pertinent part as follows:
(a) Agreement to revise price. The Government and the Contractor recognize that the costs of performing this contract cannot be accurately estimated at the time of its execution and that the contract price fixed in Article 1 may therefore be either too high or too low. They therefore agree that the contract price for the supplies under Item A of Article 1 shall be revised upward or downward in accordance with this article on the basis of actual experience of the Contractor in producing 40% of the items under Item A of Article 1 of this contract (hereinafter called the “trial run”). They recognize that the costs of performing that part of the contract will not be typical for the remainder of the contract, but will provide sufficient information and experience to permit revision of the price.
(b) Estimate of costs. . The Contractor represents that the contract price fixed in Article 1 for the supplies under Item A thereof is based on a total estimated cost of $1,455,840.00, itemized as follows:

*110 (c) Cost statements. :
(1) Within 30 days after, the completion of the trial run, the Contractor shall submit to the Contracting Officer the following data: '
(1) Separate statements showing costs of production for the trial run, itemized in- the same way as the estimated cost stated in section .(b) above.
(ii) Estimates of the cost of producing the items to be delivered during the remainder of the contract based upon the previous cost experience of the Contractor and upon all other relevant factors.
(iii) Proposed revised.prices under the contract.-
(2) The Contractor will maintain books, records, and accounts so as to reflect accurately and segregate clearly the costs of performing this’contract. For this purpose the Contractor may follow the cost accounting system regularly used by it, if the Contracting Officer finds it is adequate and in accordance with sound accounting practice. The statements showing costs experienced by the Contractor under this contract shall be based upon such books, records and accounts and shall be certified as correct by two officers of the Contractor or by an independent public accountant. The Contractor shall submit his books, records and accounts- to such examination and audit as the Contracting Officer may request.
(d) Negotiation for revision. (1) Upon the filing of the data required by section (c) hereof, the Contractor and Contracting Officer shall negotiate in good faith to agree upon revised prices under this contract. The revised price may be different for different periods of the contract and may be'in excess of or less than the price stated in Article 1 hereof. The agreement reached shall be evidenced by a' supplemental agreement to this contract stating the reviséd price under the contract.
(2) If the Contracting Officer and Contractor fail to agree on revised prices under the contract within thirty days after the date for filing of the data by the Contractor under section- (c) hereof, or such further period as may be fixed by agreement, the Contractor, if not in default, or the Government, may terminate the contract hereunder by written notice delivered within ten days after the expiration of said thirty day period or extension. Upon such termination by either party, the rights and obligations of the parties shall be governed by the provisions of Article 12 hereof (“Termmation at the Option of the Government”), except that the Contractor shall be allowed no profit for any uncompleted portion of the contract. If revised prices are *111 not agreed upon and the contract is not terminated, the Government shall pay to the Contractor the price fixed in Article 1 for the remainder of the contract.
(e) Payments. Until the contract price is revised hereunder the Government shall pay to the Contractor the price set forth in Article 1 for all articles delivered. If the contract price is revised upward hereunder, the Government shall pay to the Contractor the difference between the prices paid on all items theretofore delivered and the revised price for such items. If the contract price is revised downward hereunder an amount equal to the difference between the price paid on all items theretofore delivered and the revised price for such items, shall be applied as a credit against payments for subsequent deliveries or shall be applied in such other manner or repaid to the Government as the Contracting Officer may direct. For all items delivered after any price revision hereunder, the Government shall pay the Contractor the revised price, minus any such credit. If, before the price is redetermined hereunder, any amount paid under this contract has been included in any renegotiation agreement made under Section 403 of the Sixth Supplemental National Defense Appropriation Act, 1942, as amended, no refund or credit shall be required hereunder with respect to that amount.
* * # „ * *
Article 12 of the contract, referred to in Paragraph (d) (2) of Article 33, was entitled “Termination at the Option of the Government” and provided as follows:
(a) The performance of work under this contract may be terminated by the Government in accordance with this Article in whole, or from time to time in part, whenever the Contracting Officer shall determine any such termination is for the best interests of the Government. Termination of work hereunder shall be effected by delivery to the Contractor of a Notice of Termination specifying the extent to which performance of work under the contract shall be terminated, and the date upon which such termination shall become effective. If the termination of work under this contract is simultaneous with, a part of, or in connection with, a general termination (1) of all or substantially all of a group or class of contracts made by the War Department for the same product or for closely related products, or (2) of war contracts at, about the time of, or following, the cessation of the present hostilities, or any *112 major part thereof, such termination shall only be made in accordance with the provisions of this Article, unless the Contracting Officer finds that the Contractor is then in gross or wilful default under this contract.
(b) After receipt of a Notice of Termination and except as otherwise directed by the Contracting Officer, the Contractor shall (1) terminate work under the contract on the date and to the extent specified in the Notice of Terminations; (2) place no further orders or subcontracts for materials, services or facilities except as may be necessary for completion of such portions of the work under the contract as may not be terminated; (3) terminate all orders and subcontracts to the extent that they relate to the performance of any work terminated by the Notice of Termination; (4) assign to the Government, in the manner and to the extent directed by the Contracting Officer, all of the right, title and interest of the Contractor under the orders or subcontracts so terminated; (5) settle all claims arising out of such termination of orders and subcontracts with the approval or ratifications of the Contracting Officer to the extent that he may require, which approval’or ratification shall be final for all the purposes of this Article; (6) transfer title and deliver to the Government in the manner, to the extent and at the times directed by the Contracting Officer (i) the fabricated or unfabricated parts, work in process, completed work, supplies, and other material produced as a part of, or acquired in respect of the performance of,' the work terminated in the Notice of Termination, and (ii) the plans, drawings, information and other property which, if the contract had been completed, would be required to be furnished to the Government; (7) use his best efforts to sell in the manner, to the extent, at the time, and at the price or prices directed or authorized by the Contracting Officer, any property of the types referred to in subdivision (6) of this paragraph provided, however, that the Contractor (i) shall, not be required to extend credit to any purchaser and (ii) may retain any such property at a price or prices approved by the Contracting Officer; (8) complete performance of such part of the work as shall not have been terminated by the Notice of Termination; and (9) take such action as may be necessary or as the Contracting Officer may direct for protection and preservation of the property, which is in the possession of the Contractor and in which the Government has or may acquire an interest.
*113 (c) The Contractor and the Contracting Officer may agree npon the whole or any part oí the amount or amounts to be paid to the Contractor by reason of the total or partial termination of work pursuant to this Article, which amount or amounts may include a reasonable allowance for profit, and the Government shall pay the agreed amount or amounts. Nothing in paragraph (d) of this Article prescribing the amount to be gaid to the Contractor in the event of failure of the ontractor and the Contracting Officer to agree upon the whole amount to be paid to the Contractor by reason of the termination of work pursuant to this Article shall be deemed to limit, restrict or otherwise determine or affect the amount or amounts which may be agreed upon to be paid to the Contractor pursuant to this paragraph (c).
(d) In the event of the failure of the Contractor and Contracting Officer to agree as provided in paragraph (c) upon the whole amount to be paid to the Contractor by reason of the termination of work pursuant to this Article, the Government, but without duplication of any amounts agreed upon in accordance with paragraph (c), shall pay to the Contractor the following amounts:
(1) For completed articles delivered to and accepted by the Government (or sold or retained as provided in paragraph (b) (7) above and not theretofore paid for, forthwith a sum equivalent to the aggregate price for such articles computed in accordance with the price or prices specified in the contract;
(2) In respect of the contract work terminated as permitted by this Article, the total (without duplication of any items) of (i) the cost of such work exclusive of any cost attributable to articles paid or to be paid for under paragraph (d) (1) hereof; (ii) the cost of settling and paying claims arising out of the termination of work under subcontracts or orders as provided in paragraph (b) (5) above, exclusive of the amounts paid or payable on account of supplies or materials delivered or services furnished by the subcontractor prior to the effective date of the notice of termination of work under this contract which amounts shall be included in the cost on account of which payment is made under subdivision (i) above; and (iii) a sum equal to 2%, of the part of the amount determined under subdivision (i) which represents the cost of articles or materials not processed by the Contractor, plus a sum. equal to 8%, of the remainder of such amount, but the aggregate of such sums *114 shall not exceed 6% of the whole of the amount determined under subdivision (i), which for the purpose of this subdivision (iii) shall exclude any charges for interest on borrowings;
(3) The reasonable cost of the preservation and protection of property incurred pursuant to paragraph (b) (9) hereof; and any other reasonable cost incidental to termination of work under this contract, including expense incidental to the determination of the amount due to the Contractor as the result of the termination of work under this contract.
The total sum to be paid to the Contractor under subdivisions (1) and (2) of this paragraph (d) shall not exceed the total contract price reduced by the amount of payments otherwise made and by the contract price of work not terminated. Except for normal spoilage and to the extent that the Government shall have otherwise expressly assumed the risk of loss, there shall be excluded from the amounts payable to the Contractor as provided in paragraph (d) (1) and paragraph (d) (2) (i), all amounts allocable to or payable in respect of property, which is destroyed, lost, stolen or damaged so-as to become undeliverable prior to the transfer of title to the Government or to a buyer pursuant to paragraph (b) (7) or prior to the 60th day after delivery to the Government .of an inventory covering such property, whichever shall first occur.
(e) The obligation of the Government to make any payments under this Article; (1) shall be subject to deductions in respect of (i) all unliquidated partial or progress payments, payments on account theretofore made to the Contractor and unliquidated advance payments, (ii) any claim which the Government may have against the Contractor in connection with this contract, and (iii) the price agreed upon or the proceeds of sale of any materials, supplies or other things retained by the Contractor or sold, and not otherwise recovered _by or credited to the Government, and (2) in the discretion of the Contracting Officer shall be subject to deduction in respect of the amount of any claim of any subcontractor or supplier whose subcontract or order shall have been terminated as provided in paragraph (b) (3) except to the extent that such claim covers (i) property or materials delivered to the Contractor or (ii) services furnished to the Contractor in connection with- the production of completed articles under this contract.
(f) In the event that, prior to the determination of the final amount to be paid to the Contractor as in this *115 Article provided, the Contractor shall file with the Contracting Officer a request in writing that an equitable adjustment should be made in the price or prices specified in the contract for the work not terminated by the Notice of Termination the appropriate fair and reasonable adjustment shall be made in such price or prices.
(g) The Government shall make partial payments and payments on account, from time to time, of the amounts to which the Contractor shall be entitled under this Article, whether-determined by agreement or otherwise, whenever in the opinion of the Contracting Officer the aggregate of such payments shall be within the amount to which the Contractor will be entitled hereunder.
(h) For the purposes of paragraphs (d) (2) and (d) (3) hereof, the amounts of the payments to be made by the Government to the Contractor shall be determined in accordance with the Statement of Principles for Determination of Costs upon Termination of Government Fixed Price Supply Contracts approved by the Joint Contract Termination Board, December 31, 1943. The Contractor for a period of three years after final settlement under the contract shall make available to the Government at all reasonable times at the office of the Contractor all of its books, records, documents, and other evidence bearing on the costs and expenses of the Contractor under the contract and in respect of the termination of work thereunder.
3. The principal business of the plaintiff is the manufacture of a self-locking nut, known as the elastic stop nut. Plaintiff’s facilities included a factory at Union, New Jersey, and another of equal or larger size at Lincoln, Nebraska. Until the middle of the year of 1944, all of plaintiff’s plants and facilities were engaged in producing elastic stop nuts, principally for air frame manufacturers and for the Army and the Navy.
4. In the summer of 1944, orders for elastic stop nuts decreased, and plaintiff sought contracts with the Government in order to occupy its plants, facilities, and personnel. As a consequence, Contract No. 1932, which provided for the production of fuzes at the Union, New Jersey, plant under the supervision of the New York Ordnance District, was executed.
*116 At the time Contract No. 1932 was signed, plaintiff and defendant also made another contract, No. W-23-072-OBD-828, by terms of which plaintiff agreed to manufacture the same kind of fuzes, in the same quantity and at the same price, at plaintiff’s plant in Lincoln, Nebraska. The second contract, hereinafter referred to as Contract No. 828, was under the supervision of the Army Ordnance District at St. Louis.
5. After Contract No. 1932 was executed, plaintiff commenced performance thereunder by acquiring machine tools, machinery, and material, and by renting an additional plant at Linden, New Jersey, to supplement the facilities at Union, New Jersey.
6. By the end of 1944, there was a marked increase in the demand for elastic stop nuts. This change resulted in an increase in the production of stop nuts at Union, New Jersey, but had little effect upon the plaintiff’s Lincoln, Nebraska, plant because substantially all nut production had by then been withdrawn from the Lincoln plant. By December 1944, plaintiff’s experience in the manufacture of fuzes at Union, New Jersey, and at Lincoln, Nebraska, had demonstrated that the fuzes could be produced more efficiently and at lower cost in the Lincoln plant than at the-Union plant.
As a result of the above-described developments, plaintiff entered into conversations with representatives of the Army Ordnance Department with a view to making arrangements for coordinating all shell fuze manufacture at the Lincoln, Nebraska, plant and all stop nut manufacture at the Union, New Jersey, plant. Following these discussions, plaintiff wrote the New York Ordnance District on January 1, 1945, regarding Contract No. 1932, as follows:
Bequest is made that you permit the transfer of production operations, assembly, packaging, and shipment under this contract to our Lincoln, Nebraska, plant. All deliveries to be made f. o. b. contractor’s plant at Lincoln, Nebraska.
On the assumption that fuses produced by us will be loaded in the Midwest area there will be a definite saving to the Government in the form of freight chages [charges] because of the location of our Lincoln plant.
It is also our belief that production schedules will be *117 facilitated under this combined operation. As you know, we are in production at Lincoln under a similar contract with the St. Louis Ordnance District.
Eequest is likewise made that you also permit the transfer of all Ordnance furnished facilities and facilities acquired or manufactured by us in accordance with this contract to our Lincoln, Nebraska, plant.
Your consideration of this request and prompt response will be appreciated.
7. By letter of January 11, 1945, the defendant notified paintiff that Contract No. 1932 had been transferred from the New York Ordnance District to the St. Louis Ordnance District for administration. Attached to the letter was a copy of an order dated January 11,1945, which was directed to the District Chief of the St. Louis Ordnance District and which read, in part, as follows:
1. Jurisdiction over the subject contract is hereby transferred to his station.
2. His station is to administer this contract from this date to completion, including any price redetermination under Article 33 of Supplemental Agreement No. 3 to the contract, entitled “Eevision of Entire Price by Negotiation.”
On January 20, 1945, the contracting officer for the St. Louis Ordnance District formally authorized plaintiff to move Government-owned facilities from the plants in Union and Linden, New Jersey, to the Lincoln, Nebraska, plant.
8. Plaintiff’s letter of January 1,1945, and the defendant’s letters and orders regarding the transfer of Contract No. 1932 were the documentation of an understanding which plaintiff and defendant reached in the discussions held during the latter part of 1944. In the course of the discussions, defendant’s officers had given verbal approval to the shipment by plaintiff of machinery for the production of fuzes under Contract No. 1932 from Union, New Jersey, to Lincoln, Nebraska, and plaintiff had commenced the shipment of such machinery to Lincoln in December 1944, prior to the date of plaintiff’s letter.
9. Although the transfer of the production of fuzes under Contract No. 1932 from Union, New Jersey, to Lincoln, Nebraska, was made at plaintiff’s request, the transfer was not *118 solely for the benefit of the plaintiff. Plaintiff had responsibility for supplying elastic stop nuts to meet the requirements of the Army Air Force, and, in addition, plaintiff’s experience in the production of fuzes at the two locations indicated that the Government would benefit by shifting the production of fuzes from Union, New Jersey, to Lincoln, Nebraska.
10. When Contract No. 1982 was transferred to the St. Louis Ordnance District, plaintiff had already incurred starting load costs and other costs in connection with the production of fuzes at Union, New Jersey. None of these costs had been paid to plaintiff at that time. By January 11, 1945, the date of the transfer, plaintiff had also determined that the cost of producing fuzes at Union, New Jersey, was substantially more than the contract unit price of $1.58.
11. Prior to the time Contract No. 1982 was transferred to the St. Louis Ordnance District, a number of change orders had been issued, but the amount due plaintiff as a result of the changes had not been determined and other details in connection therewith had not been completed. After the completion of the transfer, an officer in charge of the Purchase Section of the Ammunition Division of the St. Louis Ordnance District studied the contract and suggested to the officer in charge of the Artillery Ammunition Division that, if the administration of Contract No. 1932 remained at St. Louis, the uncompleted change orders would have to be finalized by the St. Louis District and that, since the necessary facts and figures relating to the change orders were available at plaintiff’s plant in Union, New Jersey, and since the officials in charge of the New York Ordnance District were more familiar with such change orders, the administration of these matters by the St. Louis Ordnance District would result in unnecessary delay and administrative confusion. He further suggested that the desired objective could be accomplished without such undesirable results by having the contract returned to New York and terminating it there at a quantity of fuzes which would use up the parts in process and by providing for the production of the balance of the fuzes at Lincoln, Nebraska, under a new contract to be let under the jurisdiction of the St. Louis Ordnance District.
*119 12. On January 30, 1945, representatives of plaintiff and defendant met in conference in Washington, D. C., concerning plaintiff’s production of fuzes for the Government. At •that time, an officer from the St. Louis Ordnance District voiced opposition to the transfer of Contract No. 1932 for •the reasons stated in the preceding finding and suggested that the contract be returned to New York and there terminated at a practical point which would use the parts in ■process and that the cancelled portion of the contract be included in a new contract to be let for production at Lincoln, Nebraska, under the supervision of the St. Louis Ordnance District. After some discussion, both parties agreed to substitute this plan for the transfer. Before as•senting to the suggestion, one of plaintiff’s representatives inquired whether plaintiff would lose its existing rights ¡under Contract No. 1932 if the partial termination-new con-bract device were substituted for the transfer. Thereupon, ¡plaintiff’s representatives were assured and it was agreed by all present that the rights and obligations of both parties under Contract No. 1932 would, under the suggested plan, be the same as if the transfer of the contract to St. Louis remained in full force and effect.
13. Following the conference of January 30,1945, plaintiff and defendant had negotiations to effect the agreement made rat the conference. As a result of these negotiations, the contracting officer for the St. Louis Ordnance District issued •under date of January 31, 1945, a letter order for supplies, designated as Contract No. 1523, which provided for the •production by plaintiff of 2,429,000 fuzes at plaintiff’s Lincoln, Nebraska, plant at prices to be agreed upon by the parties and to be set forth in a definitive contract. On the same date, the contracting officer in St. Louis also issued •Change Order No. 6 to Contract No. 828, then being performed by plaintiff at its Lincoln, Nebraska, plant. The •change order provided for an acceleration in the deliveries •of fuzes to be made under that contract from February through June 1945.
14. Before executing the new letter order and change ■order, plaintiff’s Vice President in Charge of Sales wrote *120 the New York Ordnance District on February 3, 1945, as follows:
In accordance with the agreement reached at our meeting in Washington on Tuesday, January 30, 1945, we are willing to accept cancellation of Contract No. W-30-069-Ord-1932 contingent upon the issuance to us by the St. Louis Ordnance District of a Letter-Order of Supply for the quantity of fuses remaining undelivered under this contract and the extension of it to October 1945, inclusive.
This cancellation will be accepted without termination charge except as follows:
All units delivered are to be paid for by your district.
All facilities, tools, etc., acquired or for which commitment has been made as authorized under this contract are to be paid for by your district in accordance with terms of the contract.
The terms of Supplement 4 are to be agreed upon and settlement made for material referred to in this Supplement.
Settlement is to be negotiated for new parts, cost of reworking and payment for usable Ellwood Arsenal material received in December 1944.
Settlement is to be negotiated for repackaging of GFI heads received from Little Rock Loading Plant during December 1944.
Your prompt. attention to this matter will be appreciated.
The letter order for supplies, designated as Contract No. 1523, and Change Order No. 6 to Contract No. 828, were executed by plaintiff on February 9,1945. Both instruments were transmitted by plaintiff to the St. Louis Ordnance District with a letter from plaintiff, which was dated February 12,1945, and which read as follows:
Confirming our telephone conversation of today, you will find enclosed executed contract for supplies under Contract No. W-23-072-ORD-1523. This acceptance is made with the understanding that our Contract No. W-30-069-1932 will be cancelled in accordance with our letter of February 3.
You will also find enclosed executed Change Order No. 6 under Contract No. W-23-072-ORD-828.
*121 By letter of February 13, 1945, plaintiff was notified that the transfer of Contract No. 1932 was not accepted by the St. Louis Ordnance District and that the contract had been reinstated for administration by the New York Ordnance District. The letter also requested plaintiff to submit all invoices for payment under the contract to the New York Ordnance District.
15. On February 21, 1945, plaintiff wrote the New York Ordnance District regarding the cancellation of Contract No. 1932 as follows:
In accordance with our ’phone conversation of February 21st, we are willing to accept cancellation of Contract No. W-30-089-1932 contingent upon February production and delivered and accepted fuzes. The remaining undelivered quantity upon which we accept cancellation is 931,000 pieces.
This cancellation will be accepted without termination charge with the complete understanding that all other provisions as outlined in Contract No. W-30-069-1932 remain in full effect.
A short time prior to February 22, 1945, the New York Ordnance District transmitted to plaintiff certain papers to be executed by plaintiff and containing the terms for terminating a portion of Contract No. 1932. The papers were returned by plaintiff on the ground that they did not carry out the agreement made by the parties at the conference of January 30, 1945. On the day the papers were returned, plaintiff’s Assistant Secretary telephoned A. D. Ferguson, who was Chief of Terminations in the New York Ordnance District, and stated plaintiff’s objection to the proposed agreements.
16. On February 22, 1945, the contracting officer at the New York Ordnance District delivered to plaintiff a written notice of the partial termination, for the convenience of the Government, of Contract No. 1932. The notice of termination read, in part, as follows:
1. Effective date of TERMINATION. — You are notified that your Contract No. W-30-069-ORD-1932 (hereinafter sometimes referred to as “the Contract”) is hereby terminated (in part) for the convenience of the Government. Such termination will be effective; solely as *122 to 931,000 units of Item A (Fuze, P. D. MISAS) of the contract as soon as you have delivered under the Contract 80,000 units of such Item A, including those heretofore delivered. The Contract is further terminated as to any of said 80,000 units not completed on 28 February 1945. The remainder of the Contract is not affected by this notice.
‡ ‡ ^ ‡ ‡
6. Submission op settlement proposal. — (a) The Government desires to settle your termination claim by negotiation and on such terms as will speedily and fairly compensate you therefor. To assist you in prompt submission of your settlement proposal, there is inclosed one set of the Standard Forms of the Office of Contract Settlement.
(b) If you wish to waive any termination claim against the Government, please sign and return all three copies of the inclosed “No-Cost” Prime Contract Settlement Agreement. One copy signed by the Contracting Officer will be returned for your files.
The notice was accompanied by a document entitled “Acknowledgment of Notice and Intent to File or Not to File a Claim” and by a proposed supplemental agreement entitled “Supplemental Agreement No. 5 to Contract No. W-30-069-OED-1932.”
17. Upon receipt of the termination notice and supplemental agreement, Mr. Lightner, plaintiff’s Assistant Secretary, telephoned Mr. Ferguson and expressed a doubt as to whether the language contained in the supplemental agreement would reserve plaintiff’s rights to file claims arising under the uncancelled portion of the contract. Mr. Lightner specifically referred to the reservations contained in plaintiff’s letter of February 3, 1945, (Finding 14). Thereupon, Mr. Ferguson informed Mr. Lightner that the proviso set forth at the end of Article 1 of Supplemental Agreement No. 5 reserved plaintiff’s rights with respect to the claims referred to in plaintiff’s letter of February 3, 1945, and to other claims arising under the uncancelled portion of the contract.
During these conversations plaintiff’s Assistant Secretary thought that Ferguson was a lawyer and was attached to the legal staff of the New York Ordnance District. Mr. *123 Ferguson was not a lawyer but was Chief of Terminations in the district and in that capacity, he was authorized to negotiate terminations with contractors. He was not the contracting officer and had no authority to make promises to contractors regarding their contracts or to bind the Government by such promises. Mr. Ferguson did not consult legal counsel in the New York Ordnance District with respect to the meaning of the termination agreement.
18. As a result of his conversation with Mr. Ferguson, plaintiff’s Assistant Secretary was satisfied that plaintiff’s claims under the uncancelled portion of the contract were fully reserved by the provisions of Supplemental Agreement No. 5, which had been prepared by the defendant. On February 23, 1945, plaintiff acknowledged the notice of termination with the statement that plaintiff did not intend to file a termination claim. On the same day, plaintiff executed and returned Supplemental Agreement No. 5, which read in pertinent part as follows:
Whereas, the Contract provides that the performance of work thereunder may at the convenience or option of the Government, be terminated by the Government in whole, or from time to time in part, whenever any such termination is determined to be for the best interest of the Government, and that the Contractor and Contracting Officer may agree upon the whole or any part of the amount or amounts to be paid to the Contractor by reason of such termination; and
Whereas, by Notice of Termination dated 22 February 1945, the Government advised the Contractor of the partial termination of the Contract for the convenience or at the option of the Government, as of the date and to the extent provided in such notice, to which reference is hereby made as to the part terminated, and said part is hereinafter referred to as the “terminated portion of the Contract”; and
Whereas, the Contractor is willing to waive unconditionally any claim against the Government by reason of such termination; and
Whereas, such unconditional waiver by the Contractor will expedite settlement of the Contract and will otherwise promote the objectives of the Contract Settlement Act of 1944.
Now, therefore, the parties hereto agree as follows:
Article 1. The Contractor hereby unconditionally *124 waives any claim against the Government arising under the terminated portion of the Contract or by reason of its termination including, without limitation, all obligations of the Government to make further payments or to carry out other undertakings in connection with said terminated portion, and the Government hereby unconditionally releases the Contractor from any obligation to perform further work or services or to make further deliveries of articles or materials under the terminated portion of the Contract; provided however, that nothing herein contained shall impair or affect in any way any other covenants, terms, or conditions of the Contract.
19. Defendant’s notice of termination, which was issued on February 22, 1945, stated that the termination was effective solely as to 931,000 of the 1,011,000 fuzes originally called for under the contract, but the notice further provided that the contract was also terminated as to any of the remaining 80,000 units that were not completed by February 28, 1945. Plaintiff continued to manufacture the fuzes in process and by February 28, 1945, it had completed and delivered to the defendant 54,250 fuzes under Contract No. 1932. Plaintiff was paid for these fuzes at the contract unit price of $1.58.
The 54,250 fuzes amounted to 5.366 percent of the quantity originally called for in Contract No. 1932. However, the total number of fuzes manufactured and delivered under the contract by February 28, 1945, amounted to more than 40 percent of the 80,000 fuzes referred to in the termination notice of February 22, 1945.
20. The letter order for Contract No. 1523 (Finding 13) was formalized by a contract on May 10,1945, for the manufacture of 1,001,600 fuzes at a unit price of $1.58. The first delivery under this contract was to have been made during June 1945, but no deliveries were made, because on June 30, 1945, there was a partial termination of the contract, and on August 14, 1945, there was a complete termination of the contract for the convenience of the Government. On December 29, 1945, the parties entered into a supplemental settlement agreement, whereby defendant paid plaintiff the sum of $378,976.34 and assumed the obligation to one of *125 plaintiff’s subcontractors in an amount not exceeding $21,-868.88, and plaintiff released all claims arising under Contract No. 1523.
21. Plaintiff continued to produce and deliver fuzes under Contract No. 828 at Lincoln, Nebraska, until that contract was terminated for the convenience of the Government on August 14, 1945, following a partial termination on July 2,1945.
22. Prior to the termination of Contract No. 828, plaintiff filed with defendant an application for an increase in the contract unit price pursuant to Article 33 of the contract, and on August 27, 1945, the defendant approved a price adjustment on the first 422,600 fuzes from $1.58 to $3.0031 each, and on the next 588,400 fuzes from $1.58 to $1.7991 each.
23. On August 2, 1945, plaintiff filed with the New York Ordnance District a claim under Contract No. 1932 in the sum of $360,499.92. The letter submitting the claim read as follows:
We are submitting herewith our claim in triplicate totaling $360,499.92, on the cancellation and transfer of the subject contract for your action.
Whatever can be done to facilitate the processing of this claim would be greatly appreciated, inasmuch as, the contract now has been fully terminated at our Lincoln Plant through the St. Louis Ordnance District and we would like to be able to settle this claim in conjuction [conjunction] with our claim from Lincoln.
24. The contracting officer at the New York Ordnance District determined that plaintiff was not entitled to receive anything on its claim under Contract No. 1932, because the contractor had entered into a no-cost settlement agreement with the Government. In reviewing the supporting documents submitted with plaintiff’s claim, however, the defendant’s officers at New York and St. Louis were of the opinion that some of the charges listed in the claim might be allocable to Contracts Nos. 828 and 1523, as starting load costs. Accordingly, one of defendant’s accountants was directed to make an accounting review of the claim plaintiff submitted under Contract No. 1932.
In a report dated October 29, 1945, the accountant found that plaintiff’s costs amounted to $231,493.90 in excess of *126 payments made by defendant. The accountant also found that $64,582.57 of the excess costs was allocable to Contract No. 828 and that the remainder of $166,911.83 was allocable to Contract No. 1932. As a result of the accounting review, the Board of Awards at the St. Louis Ordnance District under date of November 9, 1945, made additional findings and recommendations for the revision of the unit price for Contract No. 828. The findings read, in part, as follows:
4. After considerable investigation of the contractor’s claim and after several discussions with Readjustment Division, this office, and NYOD and after a conference with representatives of the contractor on 6 September 1945 in St. Louis, it was agreed that a portion of this claim was rightfully and properly allocable to Contract W-23-072-ORD-828 which should have been taken into consideration during the repricing of Contract W-23-072-ORD-828. Therefore, the NYOD was requested to make an investigation of the contractor’s claim including the prorating of cost against NYOD and SLD. Since the AAF has a Field Accounting Office located at the Union, New Jersey plant at ESNA, they were requested to perform an audit of the contractor’s claim. On 24 and 25 October 1945, representatives of SLD namely Mr. Rettinger and Lt. April of Omaha Regional Office and Major Fischer of the District held a conference with the AAF auditors in New Jersey to review their audit. The results of the audit are contained in report filed by the AAF Field Accounting Officer dated 29 October which is summarized below:
Contractor’s Settlement Proposal_$330,689.13
AAF Accountant’s recommendation_ 231,493.90
The $231,493.90 is further prorated as follows:
NTOD Contract W-30-069-ORD-1932_$166,911.33
' SLD Contract W-23-072-ORD-828_ 64,582.57
The $64,582.57 represents costs attributable to Contract W-23-072-ORD-828 which were not taken into consideration in the repricing of Contract W-23-072-ORD-828. These costs represent “starting load” and manufacturing^ costs allocable to components manufactured ■at the Union, New Jersey, plant and shipped to Lincoln, Nebr., for use in the performance of Contract W-23-072-ORD-828. It is pointed out that in the repricing of ■Contract W-23-072-ORD-828 the cost of components manufactured at Union were included on the Lincoln *127 costs rather than the Union, New Jersey, costs and also certain “starting load” cost incurred at Union, New Jersey, and allocable to the Lincoln production were not included in the repricing of Contract W-23-072-OKD-■828.
5. While the above is rather lengthy, an attempt is made to present the complete facts in connection with the case because the very nature of the whole repricing has been quite involved and complex.
6. Inasmuch as the repricing of Contract W-23-072ORD-828 which was approved by the Board of Awards ■and Contracting Officer 28 August 1945 did not include .all costs properly allocable to the “Trial Run”, it is the recommendation of the Materiel Division that the repricing of the “Trial Run” be revised to include the additional costs amounting to $64,582.57. It is, therefore, requested that Contract W-23-072-ORD-828 be supplemented setting the price of the first 422,600 Fuzes •at $3.1559 which represents an increase of $0.1528 per fuze over that approved by the Board of Awards and ■Contracting Officer on 28 August 1945 and the remaining 588,400 Fuzes be priced at $1.7991 as previously approved by the Board of Awards and Contracting Officer.
7. The Materiel Division recommends the above and the supplement emboyding [embodying] the new revised unit price should reflect the fact that this unit price includes the settlement of contractor’s termination claim under the NYOD Contract W-30-069-ORD-1932 to the extent of $64,582.57 representing that portion of the entire claim allocable to the Lincoln plant, Contract W-23-072-ORD-828.
Following the action taken by the Board of Awards, plaintiff and defendant entered into a supplemental agreement under date of November 13, 1945, providing that the adjusted unit price for fuzes supplied under Contract No. 828 would be $3.1559 for the first 422,600 fuzes delivered under the contract and $1.7991 for the remaining 588,400 fuzes furnished under the contract.
25. On May 7, 1946, plaintiff filed with the contracting •officer at the New York Ordnance District a written request for the reformation of Supplemental Agreement No. 5 to 'Contract No. 1932 on the grounds that the document failed to express the true agreement between the parties in accordance with their negotiations and that the reformation would *128 promote the purposes of the Contract Settlement Act of 1944. The request for reformation was refused, and on March 3, 1947, plaintiff made a written demand that the contracting officer at the New York Ordnance District make findings of fact as to the amount due on the plaintiff’s claim under Contract No. 1932, pursuant to Section 13 of the Contract Settlement Act of 1944. On May 28, 1947, the contracting officer made his written findings of fact, in evidence as Plaintiff’s Exhibit No. 12, wherein he found that there was nothing due plaintiff on its claim, because the contractor had, by the terms of Supplemental Agreement No. 5, unconditionally waived any claim against the Government arising under the terminated portion of the contract or by reason of its termination.
26. On August 25, 1947, plaintiff appealed from the decision of the contracting officer to the Appeal Board, Office of Contract Settlement.
27. In a decision dated October 15, 1948, and in evidence as Plaintiff’s Exhibit No. 14, the Appeal Board, Office of Contract Settlement, affirmed the findings of the contracting officer insofar as such findings denied plaintiff’s claim. In its decision, the Board held that the termination notice of February 22,1945, not only cancelled the 931,000 units which were to be produced under other contracts at Lincoln, Nebraska, but also cancelled as of February 28,1945, all of the remaining 80,000 units that were not completed by the latter date; that the evidence failed to establish that Supplemental Agreement No. 5 to Contract 1932 was executed under a mutual mistake and that the language of the supplemental agreement stated exactly the agreement made by the parties at the meeting of January 30,1945, i. e., both parties clearly intended the termination-new contract device to leave both the Government and the contractor in precisely the same position as if the production of fuzes had been shifted to Lincoln by the transfer of Contract No. 1932.
With respect to plaintiff’s claim for revision of the unit price of Contract No. 1932, the Board’s opinion read in pertinent part as follows:
This leaves for consideration appellant’s remaining claim for price adjustment. The settlement agreement *129 as properly interpreted releases only those claims of appellant which relates to the terminated part of contract 1932, in other words the 931,000 plus 23,750 units canceled from contract 1932 but picked up by contracts 828 and 1523. The agreement, therefore, does not bar the assertion of appellant’s claim as one solely for a price adjustment relating to completed items. The Board must first be satisfied of its jurisdiction to entertain such a claim applicable solely to the completed rather than the terminated part of the contract. *****
Appellant relies on articles 12 (f) and 33 of contract 1932. Article 12 (f) is the equitable price adjustment clause of the Uniform Termination Article, which reads as follows: “In the event that, prior to the determination of the final amount to be paid to the Contractor as in this Article provided, the Contractor shall file with the Contracting Officer a request in writing that an equitable adjustment should be made in the price or prices specified in the contract for the work not terminated by the Notice of Termination, the appropriate fair and reasonable adjustment shall be made in such price or prices.” This clause has been authoritatively interpreted as providing for price adjustment of items continued and not canceled, the cost of which is increased as a result of termination. It does not afford a right to price revision for items completed on the effective date of termination. (Rubin v. United States, 167 F 2d 113, CCA 2d). This clause can afford no basis for relief, therefore, since all fuzes not canceled were completed items and not future production on February 28th, the effective date of termination.
Article 33 of appellant’s contract, however, is a definite provision for complete price revision, setting forth the terms and conditions upon which appellant may receive an adjustment upward or downward of the price of completed items and additional payments if the revision results in an upward adjustment of the contract price. This article, however, sets forth several conditions which the contractor has not met. Even if these conditions could be considered as effectively waived by the Government, or inapplicable under the peculiar circumstances of this case, article 33 affords no basis upon which this Board may enter an award. True, the article entitles the contractor to request a price revision bj7 negotiation on the basis of cost data furnished. Such a revision has been refused by the contracting agency. *130 Article 33 contains its own provisions for relief to the contractor upon failure or refusal of the agency to negotiate a price revision. This provision is as follows:
If the Contracting Officer and Contractor fail to agree on revised prices under the contract within thirty days after the date for filing of the data by the Contractor under section (c) hereof, or such further period as may be fixed by agreement, the Contractor, if not in default, or the Government, may terminate the contract hereunder by written notice delivered within ten days after the expiration of said thirty day period or extension. Upon such termination by either party, the rights and obligations of the parties shall be governed by the provisions of Article 12 hereof (“Termination at the Option of the Government”), except that the Contractor shall be allowed no profit for any uncompleted portion of the contract. If revised prices are not agreed upon and the contract is not terminated, the Government shall pay to the Contractor the price fixed in Article 1 for the remainder of the contract.
Disregarding the question of fact as to whether or not the contractor is in default and the possible legal consequences of default under these circumstances, the only legal right of the contractor upon the refusal to negotiate the price revision under article 33 is to treat the contract as terminated for the convenience of the Government, and to receive such payments as are provided by article 12. Article 12 provides for no right to rede-termination of price for completed articles. In effect, therefore, article 33 afforded appellant a right to request a negotiated price revision and a right to treat the contract as terminated under article 12 upon the failure or refusal of such negotiation. Nowhere in the contract is appellant given a legal right to revision of price by determination. The kind of negotiation provided for is solely that which may be undertaken by the contracting agency and involves an administrative discretion which is beyond the power of this Board.
28. Supplemental Agreement No. 5 to Contract No. 1932 was in the form which was prescribed by Paragraph 981.4 of the Joint Termination Regulations as the no-cost settlement agreement to be used in settling fixed-price prime contracts after partial termination where the contractor presents no claim. A different form was prescribed by Paragraph *131 981.3 of the same regulations for use in settling fixed-price prime contracts after complete termination where the contractor presents no claim. Paragraph 531.1 (3) of the Joint Termination Regulations, as revised August 10, 1945, provided as follows:
(3) In certain price adjustment articles providing for retrospective as well as prospective price adjustment (e. g. the standard articles formerly set out in Procurement Regulation No. 3, paragraphs 341.1 and 341.2) there is no provision with respect to the relation between price adjustment and termination. If a contract containing such an article is terminated before the event giving rise to a right to a computation or negotiation looking to a price adjustment has occurred, neither party has any right to an adjustment of the contract price of articles delivered prior to termination. In such event, however, the limitations on certain types of cost contained in subparagraph (i) in the Statement of Principles for Determination of Costs (paragraphs 551,551.2 (i)) shall apply only to the extent that such limitations would have applied if the contract had been completed and adjustment of the price had been negotiated or determined. In negotiating a settlement with respect to the terminated portion of the contract, due allowance may be made for high initial costs, if any, in accordance with the principle set forth in paragraph 551.3. Furthermore, where weight is to be given to the indicated rate of profit on such a contract, consideration should be given to the fact that the contract contained a price adjustment article. The procedure set out in paragraph 523.3 (2) shall not be applied in the case of contracts which contain an article permitting upward price adjustment and having retrospective effect, if the contract is terminated before the occurrence of the event giving rise to negotiation or determination of such price adjustment.
The date of the above-quoted revision was more than five months after the partial termination of Contract No. 1932.
29. In its letter of February 3,1945 (Finding 14) plaintiff stated that it was willing to accept cancellation of Contract No. 1932, contingent upon the issuance by the St. Louis Ordnance District of a new contract for the quantity of fuzes undelivered under the original contract and that the cancellation would be accepted without a termination charge except as to five enumerated items.
*132 The first exception related to fuzes produced and delivered under Contract No. 1932. Plaintiff has been paid for such fuzes at the contract unit price.
The second exception referred to the cost of acquiring certain tools and facilities. Article 1, covering the scope of the contract, was in two parts. Part A provided that the contractor would manufacture and deliver the 1,011,000 fuzes at the unit price of $1.58. Part B covered certain tools and facilities to be acquired by plaintiff for the account of the Government. Plaintiff has been reimbursed for the costs of acquiring such tools and facilities and asserts no claim under Article 1, Item B of the contract.
Supplement Agreement No. 4 to Contract No. 1932, referred to in the third exception in the letter, pertained to the purchase of some raw material by plaintiff from the Government. Supplement 4 was never executed. There is no evidence that any part of the claim sued upon is based on the proposed supplemental agreement.
The last two exceptions in the letter pertained to costs incurred by plaintiff in reworking and repackaging certain fuze parts supplied by the Government. The evidence does not show whether or not such costs are included in the claim in suit.
Contract No. 1523 was the contract referred to in plaintiff’s letter of February 3,1945, as a new contract providing for the manufacture at Lincoln of the quantity of fuzes that were not delivered under Contract No. 1932.
30. Plaintiff’s claim of $166,911.33 is for costs incurred in excess of payments received from defendant in the performance of Contract No. 1932. From the evidence presented thus far, it appears that such costs are based on: (1) expenditures made in preparation for the manufacture of the 1,011,000 fuzes called for under the contract prior to the partial termination of February 22, 1945, except for $64,582.57 of such expenditures that were allocated to Contract No. 828, and (2) the costs of manufacturing the 54,250 fuzes that were completed under the contract.
The defendant does not agree that the determination made by the Government accountant of plaintiff’s excess costs, as stated in Finding 24, is correct. By order of -the Court, *133 the trial was limited to the issues of fact and law relating to the right of plaintiff to recover. If it is held that defendant is liable to the plaintiff, the amount of such liability is to be determined on the basis of proof to be presented at a subsequent trial.
CONCLUSION OF LAW
Upon the foregoing special findings of facts the court concludes that as a matter of law the plaintiff is entitled to recover. The case is referred to a commissioner of the court for further proceedings for the determination of the amount of the judgment.