words which Congress used for one obvious purpose, an additional application which, taken literally, they might support. The evil which Congress meant to cure by the words it used, it cured. The additional effect contended for by the Government would destroy a practice which no one had ever even intimated to be an evil, and which responsible officials had, for more than forty years regarded as just and necessary."

We can find no inconsistency between the 1885 Resolution and the 1938 Resolution. The 1938 Resolution says nothing on the subject of gratuity pay in situations where work was actually performed on a holiday. The 1885 Resolution has been consistently construed to grant gratuity pay in addition to regular pay for holidays worked and the 1938 Resolution only repealed the 1885 Resolution to the extent that it may be inconsistent.

Plaintiff has been paid for his holiday work. He is now asking only for the gratuity pay granted him under the 1885 Resolution.

All of the circumstances, including the legislative history of the 1938 Resolution, indicate that Congress did not intend to eliminate the customary practice of granting gratuity pay for days worked on holidays occurring on a regular work day. Furthermore, the 1938 Resolution can be given the construction contended for by plaintiffs herein without doing violence to its language or creating an inconsistency with the 1885 Act.

The fact that during this period the Secretary of the Navy, in accordance with a directive of the President, issued a directive that holidays, with the exception of Christmas, be considered as regular work days, would have nothing to do with the issue here. If the Government required per diem employees to work on holidays, it should pay for such services.

Plaintiffs are entitled to recover. Judgment will be suspended pending a report from the General Accounting Office as to the exact amount due each plaintiff.

It is so ordered.

JONES, Chief Judge, and MADDEN and LITTLETON, Judges, concur.

WHITAKER, Judge.

I dissent for the reasons stated in *Kelly v. United States*, 96 F.Supp. 611, 119 Ct.Cl. 197; affirmed 342 U.S. 193, 72 S.Ct. 213, 96 L.Ed. 222.

**ELASTIC STOP NUT CORPORATION OF AMERICA**

**v.**

**The UNITED STATES.**

**No. 48986.**

United States Court of Claims.
July 12, 1955.

Martin E. Rendelman, New York City, Warren E. Burger, Asst. Atty. Gen., Paris T. Houston, Washington, D. C., on the brief, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

MADDEN, Judge.

In prior proceedings before this court, we decided that the plaintiff was entitled to recover the amount which it had expended, in the performance of a contract for the manufacture of shell fuzes for the Government, in excess of the amount which it had been paid. 113 F.Supp. 446, 126 Ct.Cl. 100. We referred the case to a commissioner of this court to take evidence and make a report as to what should be the amount of the judgment. The case is now before us on that question.

The plaintiff's claim is based upon its contract No. 1932, for the manufacture of shell fuzes at its Union, New Jersey, plant. As appears in our former findings and opinion, the plaintiff had, at the same time, another contract, No. 828, to manufacture shell fuzes at its Lincoln, Nebraska, plant. During the course of performance, by agreement of the parties, much of the work which was to have been done at Union was transferred to Lincoln, and many parts manufactured at Union were shipped to Lincoln to be there incorporated into completed fuzes. This transfer created difficult problems of accounting, as to which contact should be charged with starting costs, overhead and many other items. The total amounts chargeable to the two contracts was reasonably ascertainable, but there was much room for difference of accounting opinion as to the allocation of these costs as between the two contracts.

At a certain stage of performance, the Union contract was terminated, while the Lincoln contract was still in the process of performance. The plaintiff presented a claim for its excess costs, allocating a large proportion of them to Lincoln. An accountant of the Army Air Forces Field

Hamilton Hicks, New York City, Fredric P. Weller, New York City, on the briefs, for plaintiff.

Accounting Offices made an audit of the plaintiff's records, hereinafter called the FAO audit. He greatly reduced the amount of the plaintiff's claim, concluding that the plaintiff's unrecovered costs at Union were $231,493.90. He determined that, of this amount, $166,911.33 was allocable to contract No. 1932, the Union contract, and $64,582.57 was allocable to contract No. 828, the Lincoln contract.

The plaintiff accepted the FAO audit. It was not concerned about the allocation of a smaller amount to the Lincoln contract than its own proposed accounting would have made. It expected that, in the settlement of the two contracts, it would be paid its unrecovered costs. Thereafter the plaintiff and the Government made a final settlement of the Lincoln contract, including in the settlement the $64,582.57 of the Union costs which the FAO audit had allocated to the Lincoln contract.

The contracting officer for the Union contract denied completely the plaintiff's claim on that contract asserting that the plaintiff's acceptance of a certain Supplemental Agreement No. 5 amounted to a waiver of any termination claim. In our former opinion in this case we concluded that the agreement did not have that effect and that the plaintiff might recover such excess costs as it could prove. The Government suggested that the FAO audit, which the plaintiff had accepted and which was the basis of its suit for $166,911.33, might be inaccurate or contain duplications, as between the two contracts, and that evidence should be taken on that question. In the further hearing before our commissioner, the Government presented a new audit made by the Federal Bureau of Investigation. This audit showed that the plaintiff's unrecovered costs, after crediting the $64,582.57 allocated to the Lincoln contract in the FAO audit, and paid to the plaintiff in the settlement of that contract, were $191,498.67, instead of the $166,911.33 shown in the FAO audit.

In the FBI audit, however, the allocation of the costs between the two contracts is different. It would allocate $85,041.07 more to the Lincoln contract leaving only $106,457.60 available for recovery in this suit which is based on the Union contract.

Our commissioner has found that the allocations made in the FAO audit were more accurate than those in the FBI audit. The Government excepts to this finding, pointing to the fact that the plaintiff, in submitting its original claim, made large allocations to the Lincoln contract, as the FBI audit has done. But the Government's FAO auditor did not accept the plaintiff's proposed method of accounting and made larger allocations to the Union contract and the plaintiff acquiesced in that audit. The Government also says that the FBI audit was made more carefully, with more men spending more time on it.

If, at this stage of these proceedings, there were unanimity of opinion among expert accountants that the FBI audit was more scientifically accurate, it would not affect our conclusion in this case. The Government made its FAO audit. The plaintiff settled the Lincoln contract, accepting the $64,582.57 which the audit had allotted to that contract, as payment in full on that account. Now the Government proposes to allocate $85,041.07 more to that extinct account, where it would be beyond the reach of the plaintiff. It is too late to do that, merely for the purpose of preserving the niceties of scientific accounting. The plaintiff is still willing to accept the $166,911.33 found to be due it by the FAO audit, and we hold that it is entitled to that principal amount.

The plaintiff contends that it is entitled to interest at the rate of 2½ percent per annum on the principal amount which we have found due it. Section 6 (f) of the Contract Settlement Act of 1944, 58 Stat. 649, 654, 41 U.S.C.A. § 106(f), provides for the payment of such interest on any termination claim, the interest to begin thirty days after the date fixed for termination. The Government urges that the plaintiff's claim was not a termination claim, but a claim,

under Article 33 of the contract, for an adjustment in the unit price of the completed fuses manufactured under the unterminated portion of the contract.

We think the plaintiff's claim was a termination claim. As shown in our earlier findings and opinion, 113 F. Supp. 446, 126 Ct.Cl. 100, there was a formal termination; the plaintiff filed a claim; the Government asserted that the form which the plaintiff had signed in connection with the termination was a waiver of a right to file a termination claim; we held that it was not such a waiver and determined that the Government was liable on the claim. The plaintiff's petition was based upon a termination claim. From Government writing and from the testimony of a Government expert it appears that the claim was a termination claim. The Government's Appeals Board held that the only kind of claim available to the plaintiff was a termination claim. In our prior decision we said that the plaintiff was entitled to the benefits of the Article 12(f) of the contract.

All of Article 12 relates to "Termination at the option of the Government". Section (f), in particular, of Article 12, relates to the adjustment of the price of work not terminated in an otherwise terminated contract. We held that the Board of Contract Appeals could have made such an adjustment. If it had done so, with reference to the 54,250 fuses which had not been terminated, that would have reduced, by the amount of the adjustment, the amount of the plaintiff's claim for starting costs, etc., on the terminated portion of its contract. But no such adjustment was made, hence all of the claim continued to be included in the termination claim.

The Government points to testimony of a witness for the plaintiff, and statements of plaintiff's counsel, to show that they were claiming the benefits of Article 33 of the contract, which related to price revision without termination. The Government persistently and probably rightly insisted that Article 33 was not applicable, in the circumstances. We think the substance of the plaintiff's claim was not changed by these casual departures from the proper theory of the case.

The Government urges that since Article 12, the termination agreement of the parties, made no mention of interest, interest may not be recovered. We think the interest provision of the statute is mandatory, at least to the extent that it is not negatived by mere silence.

The plaintiff may have a judgment for $166,911.33, with interest at 2½ percent from March 24, 1945.

It is so ordered.

JONES, Chief Judge, and LARAMORE, WHITAKER, and LITTLETON, Judges, concur.

**Dewey J. CRITES, Jack Mayta, and James Willette**

v.

**The UNITED STATES.**
**Congressional No. 8–52.**

United States Court of Claims.
July 12, 1955.