225 F.2d 302
 UNITED STATES of America, Plaintiff-Appellant,
v.
LENNOX METAL MANUFACTURING COMPANY, Inc., and Frank Margiotta and Herbert B. Pearl, as Co-Trustees of the Lennox Metal Manufacturing Company, Inc., Defendants-Appellees.
 No. 280.
 Docket 23451.
 United States Court of Appeals Second Circuit.
 Argued April 19, 1955.
 Decided August 1, 1955.
 
 The facts found by the trial judge are as follows:
 On April 25, 1951, the Lennox Metal Manufacturing Company, Inc., then a solvent sheet-metal subcontractor, procured from the Department of the Army, New York Ordnance District, a letter contract for the manufacture of 887,000 .50 caliber metal ammunition boxes. In June the parties signed a more formal agreement, designated Supplemental Agreement No. 1, specifying price, quantity, and delivery schedules. The "Defaults" clause and the "Disputes" clause of that contract are set out in the footnote.[1]
 In August 1951, the Ordnance District issued the first of a series of change orders, designated Change Order "A," altering certain specifications and changing the type of carton used for packaging the ammunition boxes.
 Since June 1, 1951, Lennox had protested certain discrepancies in the specifications and recommended corrective changes. On August 29, 1951, and on September 28, 1951, the Ordnance District issued Change Orders "B" and "C," adopting Lennox's recommendations. Compliance with these change orders required extensive retooling.
 After Lennox had procured the letter contract, it ordered the type of steel designated by the contract, but the steel was unworkable and unsuitable for the boxes. Apparently other contractors experienced similar difficulty, and in September Lennox, several other contractors, steel representatives and representatives of various Ordnance Districts concerned, met to discuss it. As a result of that conference, Ordnance issued Change Order "D" on November 23, 1951, changing the carbon content of the specified steel. In December, it issued Change Order "E," providing for an indentation on the bottom of some of the boxes. As a result of these various changes, Lennox did not comply with the delivery schedule called for by Supplemental Agreement No. 1. On January 31, 1952, the parties signed Supplemental Agreement No. 2, providing for a deferred delivery schedule.
 During this period, Lennox had incurred large costs in complying with the various change orders issued by the Ordnance District. In February, it presented to the government an invoice showing costs of approximately $437,000 and requested partial payment. Ordnance informed the company that it could receive partial payment of 75% of its invoice, but only if the contract were amended to allow for partial payments and if Lennox provided consideration for the amendment. On March 3, 1952, the parties signed Supplemental Agreement No. 3, containing a clause providing for partial payments, as set forth in part in the footnote,[2] for a consideration of $3, 279.64, which was 1% of 75% (the anticipated partial payment) of the invoice.
 Following that agreement, there was some production and delivery, lasting until June. In June, production was again disrupted, due to the national steel strike. The parties then signed, on July 17, 1952, Supplemental Agreement No. 4, excusing Lennox for delays in performance and setting a delivery schedule subject to delays caused by the strike.
 Shortly after the execution of Supplemental Agreement No. 3 in March, Lennox had requested a partial payment of 75% of the $437,000 invoice. The Ordnance District had refused to make the entire payment, but did make a payment of approximately $150,000, which went directly to the Mastan Company, Lennox's assignee and holder of a chattel mortgage on all of Lennox's equipment and machinery. Lennox protested vigorously against the failure to pay the full 75% requested.
 On July 16, 1952, the Ordnance District issued change order "H," which required substantial changes in the manufacture of the boxes at no cost to the government and with no change in the delivery schedule. Lennox refused to accept the change order, and, on August 20, 1952, the government issued Change Order "I," similar to "H," except that it allowed Lennox to spend up to 10% of the contract price in making the changes required by its terms. Compliance with Change Order "I" required retooling of from 60 to 90 days — during which there could be no production — and expenses of approximately $120,000.
 On August 31, 1952, Lennox presented an invoice of $235,427 for partial payment. That amount included costs incurred in making changes in compliance with Change Order "I." On September 4, 1952, Lennox conferred with Ordnance District representatives and was advised that a partial payment would be made. On September 22, the company advised the Ordnance District that it would be unable to resume production until a partial payment was made.
 However, no such payment was ever made. On September 18, 1952, Ordnance issued a 10-day notice of intention to terminate the contract unless Lennox could demonstrate its ability to produce in accordance with the delivery schedule. On October 1, Colonel Walker, head of the Ordnance District, advised Lennox that he would continue the contract if defendant had facilities to complete it on time, and would utilize the monies made available for the purpose. He stated that he would send a production team to determine whether Lennox had facilities suitable for completing the contract and, if the production team reported favorably, he would send a fiscal team to work out a partial-payment program. A production team did visit the plant and reported that Lennox could fulfill its contract if it had the requisite financing. A fiscal team then reported that a partial-payment plan to insure sufficient funds had been worked out. Despite these reports, Colonel Walker, on October 20, 1952, notified Lennox that he intended to terminate the contract and, on October 31, 1952, sent out a notice of termination which is set forth in the footnote.[3]
 The Government's complaint in this action, as amended in March 1953, sought possession and title to all property covered by the partial payments, under the provision of the Partial Payments Clause providing that, upon the making of any partial payment, title to all materials, investory, and non-durable tools acquired by or produced for the performance of the contract shall vest in the government. The Government also demanded $149,118.38 for unrecouped partial payments. Lennox counterclaimed for damages arising out of the contract. The trial judge found that the government had breached the contract and denied recovery or title to the government. He dismissed the counterclaims for lack of jurisdiction, but without prejudice to their prosecution in the Court of Claims. The Government appeals from that part of the judgment adverse to it. Defendant has not appealed from the order dismissing the counterclaims.
 Leonard P. Moore, Brooklyn, N. Y. (William C. Gordon, New York City, of counsel), for appellant.
 Timen & Waters, Kadel, Wilson & Potts, New York City, Nathan Korn, Brooklyn, Edwin Slote, New York City (Lawrence S. Timen, New York City, and W. Philip Van Kirk, Tuckahoe, of counsel), for appellee.
 Before FRANK, MEDINA and HINCKS, Circuit Judges.
 FRANK, Circuit Judge.
 
 
 1
 The trial judge found that, when the government notified defendant of the termination of the contract, defendant was not in default. The evidence amply supports that finding.
 
 
 2
 The original contract set forth no delivery schedule. Supplemental Agreement No. 1 provided for deliveries starting on or before July 31, 1951. Supplemental Agreement No. 2 dated January 31, 1952, states that "it has been administratively determined that the Contractor was excusably delayed from 1 September 1951, by reason of unforeseeable delays in delivery of materiel and by reason of acts of the Government." And Supplemental Agreement No. 4, signed July 17, 1952, stated that "it has been administratively determined that the Contractor has been excusably delayed in the performance of the contract," and substituted a delivery schedule, "subject to delay in receipt of steel" as a result of the strike. From July 17 to August 20, Lennox received no mill steel because of the strike, and on August 20 the Government issued Change Order "I," which, the trial judge found, required retooling for some sixty to ninety days, during which there could be no production. Before that period had expired, the contract had been terminated.
 
 
 3
 Even without the administrative determinations of justifiable delay contained in the supplemental agreements, the record shows that Lennox was not in default. Because of discrepancies in the specifications and the change orders necessary to correct them, the trial judge found, on evidence which fully supports him, that the lack of production up to March 3, 1952, was entirely the fault of the government; that Lennox produced substantially in accordance with delivery schedules between March 3, 1952 and June 2, 1952; and that delays after that date were due, first to the steel strike, and then to Change Order "I."
 
 
 4
 A majority of the court — Judges MEDINA and HINCKS — think that the government was not in default. Their views — in which the writer of this opinion concurs as an alternative basis of affirmance — are set forth in Point II of this opinion.
 
 I.
 
 5
 The separate views of the writer of this opinion are as follows:
 
 
 6
 The trial judge found that, at the time of the contract's termination, the government was itself seriously in default, in that it had fallen very substantially short in discharging its obligation to make partial payments in accordance with the Partial Payments Clause — that, indeed, it was solely because of that default that defendant could not thereafter have performed. If the judge was correct in that respect, he was also correct in holding that the government wrongfully terminated the contract and therefore cannot ground its action on the title provision of that clause.
 
 
 7
 This conclusion turns on the meaning of the Partial Payments Clause. The problem may be approached from two angles: (a) the interpretation of the contract; (b) reformation of the contract.
 
 
 8
 It should be noted at the outset that, as the contract was one with a federal agency, the doctrine of Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, does not apply. See, e. g., Clearfield Trust Company v. United States, 318 U.S. 363, 366-367, 63 S.Ct. 573, 87 L.Ed. 838; Phelan v. Middle States Oil Corporation, 2 Cir., 220 F.2d 593, 617.
 
 
 9
 The Partial Payments Clause was added on March 31, 1952 by Supplemental Agreement No. 3. Colonel Walker, the principal contracting officer of the New York Ordnance District, testified that, if, when Supplemental Agreement No. 3 was made, the defendants' incurred costs were $437,283.39, and if defendants were not then in default or likely to be, the government would then have paid defendants 75% of that amount as a partial payment. Answering a question put by the judge, Walker added: "We are doing it every day with hundreds of other contracts."[4] He had previously testified, in answer to the judge's questions, that it was the "practice" to pay "75 percent of allowable substantial costs," and that what the Partial Payments Clause "really meant" was that a payment of 75% of such cost would be made if the contractor was a "good risk."[5] Subsequently, the following colloquy occurred:
 
 
 10
 "The Court: Colonel Walker said that it was the pattern and common knowledge and the practice among all the contractors to pay them 75% so it was well known that that was what the Government did; is that right?
 
 
 11
 "Mr. Flagg (government counsel): I will accept that."[6]
 
 
 12
 Walker further testified that Mr. Stadler, a government employee, had been authorized — that it was his "duty" — to negotiate Supplemental Agreement No. 3, and the duty of Kelly — Chief of the Legal Section of the New York Ordnance District — to draft it. In the light of Walker's testimony, as construed by the judge with the acquiescence at the trial of government counsel, we turn to the testimony of Pearl, defendant's president. He testified as follows:
 
 
 13
 He was told that Stadler was to negotiate with him "toward working up a partial payment clause to be inserted in our contract so that money could be made available to us under that clause." Pearl informed Stadler that defendant's incurred costs as of January 1932 were some $437,000. Stadler told Pearl that defendant "could get 75%, which was * * * $327,964.04." Stadler stated that, in order to justify the addition of the Partial Payments Clause, defendant would have to give consideration to the government and that a sufficient consideration would be "one percent of the 75% of our incurred costs, in other words, of $327,964.04. * * * That was the understanding; he stated to me that we were going to get $327,000 and we were going to pay the Government $3200, and that was the understanding and the arrangement we had at that time, on or about February 19, 1952." Stadler took Pearl to Kelly; Stadler told Kelly, in Pearl's presence, that "he had just completed the negotiations of a partial payment arrangement which called for the payment of $327,000, and he asked him to prepare the proper legal papers which would make it possible for that to be part of the contract." Supplemental Agreement No. 3 resulted.
 
 
 14
 The foregoing has marked significance in several respects:
 
 
 15
 (a) The uniform conduct of the government in paying other contractors 75%, pursuant to the Partial Payments Clause, serves as an administrative interpretation of that clause and of the Regulation.[7] Since such was the uniform practice of the New York Ordnance District, it is proper to infer, absent contrary evidence, that, on the basis of the so-called "presumption" of regularity, the Department of the Army had approved and adopted this interpretation, i. e., one which left no room for the exercise of discretion when the contractor was not in default (or a "bad risk").
 
 
 16
 (b) The uniform governmental practice fully supports Pearl's testimony that, in agreeing to that clause, and in agreeing to pay as a consideration 1% of the 75% of defendant's incurred costs, defendant was advised by the government's representatives that the clause meant that the government would surely pay defendant 75% (less 1% of 75%). Thus both parties intended that clause to be so understood.
 
 
 17
 Especially because of Walker's testimony concerning the government's uniform practice, the evidence of surrounding circumstances, including the negotiations, becomes markedly important in determining what the parties meant by the word "may" in the Partial Payments Clause. For, in appropriate circumstances, the word "may" has often been construed as "shall."[8]
 
 
 18
 Some authorities hold that such extrinsic evidence may be considered, only if the language of the contract is ambiguous. The government contends that "may" confers unrestricted discretion. We think that, in its context, "may" sufficiently lacks clarity to satisfy the "ambiguity" test,[9] that its meaning is "not so clear as to be self-evident",[10] that it was "capable of being understood in more senses than one".[11]
 
 
 19
 It bears on the meaning of "may" in this contract that, if that word is construed as wholly permissive, unreasonable consequences would ensue: (a) On that interpretation, defendant paid $3,200 for the addition of a clause which would yield defendant nothing unless the Contracting Officer, governed by mere whim, chose to direct a payment. (b) At the trial, government counsel conceded that, under the interpretation for which the government then contended, the clause would give the government, upon termination of the contract, title to thousands of dollars of property even if the government had made a partial payment of but $50.[12] If this interpretation were correct, then the clause "set a skillful trap" for the "unwary" defendant, and "No such purpose should be attributed to the government. * * * In construing the document the presumption should be indulged that both parties were acting in good faith." Sylvan Crest Sand & Gravel Co. v. United States, 2 Cir., 150 F.2d 642, 643. It "is not out of place to say that the government should be animated by a justice as anxious to consider the rights of the bidder as to insist upon its own." United States v. Purcell Envelope Company, 249 U.S. 313, 318, 39 S.Ct. 300, 301, 63 L.Ed. 620. As the government now seeks to construe the contract, it comes close to being "`such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other'"; accordingly, that construction should be rejected if possible. See Hume v. United States, 132 U.S. 406, 415, 10 S.Ct. 134, 137, 33 L.Ed. 393; Scott v. United States, 12 Wall. 443, 445, 20 L.Ed. 438.
 
 
 20
 But even if "may" is not thus ambiguous, evidence of the negotiations was admissible. The "ambiguity-on-its-face" rule is a vestigial remain of a notion prevailing in "primitive law." "The primitive law," says Wigmore, "looked only at the expression. * * * The mark of primitive legal standards, throughout all, is formalism."[13] Plucknett tells us that "until late in the Middle Ages, English lawyers tried to avoid the problem of interpretation. Indeed, even the word [i. e., interpretation] connoted in their minds fraud or evasion."[14] Says Paton, in "primitive law," the "binding element is sought in the sacred ritual and not in the intention of the parties."[15] With the advent of writing, the written word came to possess a magic potency.[16]
 
 
 21
 The "primitive" — ritualistic and magical — attitudes have relaxed their grip. The later rationalization that, to receive extrinsic evidence is to court the danger of perjury, has also been eroding: Such evidence is now everywhere received to show, for instance, (a) fraud or illegality, (b) that an apparent deed is but a mortgage, or (c) that a written contract was not to become operative except upon the happening of an orally agreed-upon condition.[17]
 
 
 22
 Even if a word in a written agreement is not ambiguous on its face, the better authorities hold that its context, its "environment," must be taken into account in deciding what the parties mutually had in mind when they used that verbal symbol.
 
 
 23
 The problem of interpreting a contract is, of course, that of understanding the communication between the parties.[18] Like many communication-problems in non-legal fields, it is frequently none too easy of solution.[19] Judge Learned Hand has sagely warned that, in attempting a solution, it is "one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary * * *."[20] This warning has an ancient lineage. Ihering (in the middle of the 19th century) taught that the Roman jurists had emphasized the "spirit" as against the letter, and noted that, "A close adherence to the letter is a mark of unripeness everywhere, and especially in law."[21] In the 14th century, an Italian lawyer, Lucas De Penna, scorned the suggestion that the "dictionary equivalents" of words constitute the sole basis of ascertaining their meaning, and opposed literal interpretation (or "pure verbalism"), since words are but clumsy "vehicles" of expression, and the isolation of words from their context is the mark of an inexperienced interpreter.[22] In 1932, it was observed in Hurst v. W. J. Lake & Co., 141 Or. 306, 16 P.2d 627, 629, 89 A.L.R. 1222 that "the language of the dictionaries is not the only language spoken in America." Corbin, in 1951 said, "There is no dictionary on earth * * * that can record all the usages of words or other symbols. * * There is no law requiring the contractors to express themselves in `good English'. * * * On the contrary, the law requires the court to put itself as nearly as possible, in the position of the parties, with their knowledge and their ignorance, with their language and their usage. It is the meaning * * * of the parties, thus determined, that must be given legal effect."[23]
 
 
 24
 Accordingly, it is regarded by many authorities as a fallacy that, in interpreting contractual language, a court may not consider the surrounding circumstances unless the language is patently ambiguous. Any such rule, like all rules of interpretation, must be taken as a guide, not a dictator.[24] The text should always be read in its context. Indeed, text and context necessarily merge to some extent, just as an individual's "inner environment" includes the air in his lungs.[25] When the text is in a foreign language, which environs it, resort to a translation becomes necessary;[26] when the parties to an American-worded contract employ their own private language, foreign to the judge, he should similarily translate its apparent meaning by resort to their private glossary.[27] The parties may use "their own special dictionary" which (when put in evidence) supplies the key to what their words meant to them.[28] On this view, the apparent "public" meaning must give way to the parties' "private" meaning, for they have created their own little "public," their own private public.
 
 
 25
 The preliminary negotiations often function as a most important part of the "contractual history" of the words employed. Our courts have come to rely on the "history" of a statute in construing its literal verbiage.[29] Many of those judges who, through scepticism about that technique, have developed a sort of context-phobia with reference to statutes,[30] have no doubts about judicial reliance on a contract's history. For, as Professor Richard Powell points out,[31] the words of a statute are usually chosen by but a portion of the legislature, and the purposes of that small portion "are often wholly unknown and unapproved" in actuality by most members of that body, while the words of a contract are selected by the parties whose purpose is far more readily ascertainable by consulting their negotiations.[32]
 
 
 26
 To shut out the light furnished by the parties themselves — to read their words not as they meant them but as they appear when denuded of that meaning — is to decide an unreal, fictitious, hypothetical case. To reject the insights derived from their previous negotiations, which reveal their actual purposes, is to create a narrow rule of relevance which artificializes the facts.[33] Doubtless on that account, even those courts which still say ambiguity is a necessary condition of considering such extrinsic evidence are quick to find such ambiguity, on slight grounds, when the extrinsic evidence is convincing.
 
 
 27
 Our court has taken the broader view. In Nicoll v. Pittsvein Coal Co., 2 Cir., 269 F. 968, 971-972, this court (per Hough, J.) said, "[W]e think that there is no reason in the nature of things why the individual parties to a transaction may not employ words or whole phrases in a particular sense irrespective of the ordinary sense. * * * In sound theory there is in each case only a question of fact, viz.: Were the parties using words in a special mutual sense? * * * [T]here is no doubt at all that ambiguity in phrase is not necessary to let in evidence of usage." In Rotberg v. Dodwell & Co., 2 Cir., 152 F.2d 100, 101, we said: "[T]he intent is made clear by the affidavit of defendant's attorney which, after reciting this background, states that he explicitly told plaintiffs' attorney that he would require a general release so as to terminate all possible claims by plaintiffs in the future, as well as in the present. Plaintiffs insist that this statement cannot be considered under the parol evidence rule. But that rule does not exclude evidence to interpret, explain, or clarify (rather than contradict) the written document."
 
 
 28
 Writes Corbin: "Words have no meaning; it is users of words who give them meaning.[34] * * * It is sometimes said that if the words of a contract are plain and clear, evidence of surrounding circumstances to aid interpretation is not admissible. But some of the surrounding circumstances always must be known before the meaning of the words can be plain and clear; and proof of the circumstances may make a meaning plain and clear when in the absence of such proof some other meaning may also have seemed plain and clear.[35] * * * It is not necessary that words should be unusual words or words that are `ambiguous on their face' in order to admit evidence of special usage. And evidence often establishes a special and unusual meaning definitely in conflict with the more common and ordinary usage.[36] * * Among the surrounding circumstances that are admissible for purposes of interpretation are included many acts and statements of the parties antecedent to and contemporaneous with the making of the contract. But, it may be asked, does not the `parol evidence rule' exclude evidence of such antecedent statements and understandings? The answer to this question is No. That supposed rule of evidence purports to exclude testimony only when it is offered for the purpose of `varying or contradicting' the terms of an `integrated' contract; it does not purport to exclude evidence offered for the purpose of interpreting and giving a meaning to those terms. The terms of any contract must be given a meaning by interpretation before it can be determined whether an attempt is being made to `vary or contradict' them. The question in any particular case, therefore, may become this: When does interpretation cease and when does variance begin? So far as this question is concerned, any and all surrounding circumstances may be proved so long as they are material and relevant on the issue of what the contract is and what meaning should be given to its words.[37] * * * The court will give legal effect to the words of a contract in accordance with the meaning actually given to them by one of the parties, if the other knew or had reason to know that he did so. In determining the meaning so given by the one and the fact of knowledge or reason to know by the other, the court will hear all relevant evidence of the surrounding circumstances, including the admissions of the parties, the negotiations and antecedent communications between them, and all current usages that might have affected their choice of the words. In the process of interpretation, it is the court and not the parties who should be reasonably, or even remarkably, intelligent.[38] * * * In determining whether the two parties gave the same meaning to their express words and what that meaning was, or in determining whether one party gave a particular meaning to the words and the other knew or had reason to know that he did, the court will need to know the preliminary negotiations and communications between the parties to the contract. These are among the relevant surrounding circumstances; and evidence of what they were is admissible. This is true, even though the words of the contract seem to the judge to have a `plain and clear' meaning for him. A reasonably intelligent judge will not try to force his meaning upon the parties, when relevant and trustworthy evidence may convince him that one or both of them had another meaning.[39] * * * As long as the court is aware that there may be doubt and ambiguity and uncertainty in the meaning and application of agreed language, it will welcome testimony as to antecedent agreements, communications, and other factors that may help to decide the issue. Such testimony does not vary or contradict the written words; it determines that which cannot be varied or contradicted.[40] * * * A contractor is bound in accordance with the meaning that he induces another to understand and act upon, if he knows or has reason to know that the other will so understand and act. And in determining whether or not he has reason to know, the court should be advised of all the surrounding circumstances; of the meaning that is given to the language of the agreement by common usage, by usage in the trade or business or profession of the parties; of communications between the parties during preliminary negotiations and during the execution of the writing; and of subsequent interpretations and practical application by either party that is assented to or acted upon by the other."[41]
 
 
 29
 For authorities supporting Corbin, see, e. g., United States v. Bethlehem Steel Co., 205 U.S. 105, 117-118, 27 S.Ct. 450, 51 L.Ed. 731; Nicoll v. Pittsvein Coal Co., 2 Cir., 269 F. 968; U. S. Navigation Co. v. Black Diamond Lines, 2 Cir., 147 F.2d 958, 961; Rotberg v. Dodwell & Co., 2 Cir., 152 F.2d 100, 101; Franklin Sugar Refining Co. v. Wm. D. Mullen Co., 3 Cir., 12 F.2d 885; American Lithographic Co. v. Commercial Cas. Ins. Co., 81 N.J.L. 271, 80 A. 25; Right Printing Co. v. Stevens, 107 Vt. 359, 365, 179 A. 209, 100 A.L.R. 528; Atlantic Northern Airlines v. Schwimmer, 12 N.J. 293, 96 A.2d 652, 656; concurring opinion in Universal Sales Corp. v. California, 20 Cal.2d 751, 776, 128 P.2d 665; Kessler & Sharp, Contracts (1953) 80-81, 96-97; 9 Wigmore, Evidence (3d ed.) Sections 2461ff; Wigmore, Evidence, Students' Textbook (1935), 521, 522, 524-525.
 
 
 30
 These rulings deserve peculiar emphasis when, as here, one of the parties drafted the contract, couching it in complicated terms set forth in crowded print; for then the court should follow the contra proferentum rule, i. e., should adopt that interpretation, the legal effect of which bears most strongly against the one who chose the words.[42] And where, as here, the government official in charge has given the other party an interpretation of the "verbose and complicated Government writings," that party may properly rely upon that interpretation.[43]
 
 
 31
 3. Even were we constrained by the "ambiguity-on-the-face" rule, we should, on the facts here, hold that the contract must be reformed so that "may" is not permissive, as the government contends. That is, if "may" on its face means unregulated discretion, the contract must be rectified because it mistakenly reflects the actual intention. It matters not here whether we call this a case of mutual mistake[44] or one of mistake by defendant which plaintiff knew and induced.[45] The evidence of mistake amply justifies such relief: It is most clear and convincing. Under the federal merged procedure, the court can grant such equitable relief and then treat the contract as thus reformed.[46] As here there was no jury, the judge could perform both those functions. It is of no moment that defendant did not formally ask such relief, for we may regard its pleading as amended to conform to the proof.[47]
 
 
 32
 4. Colonel Walker testified that the reason for the government's termination of the contract was that defendant at that time was in default on deliveries under the original contract and under the supplemental agreements. But, as shown above, defendant was not then in default.
 
 
 33
 The government, then, wrongfully terminated the contract. The title provision of the Partial Payments Clause did not entitle the government to assert that title and to seek delivery of the property when defendant was not in default but when the government had substantially breached its contractual obligation and in such a way as to prevent defendant's performance.[48]
 
 
 34
 5. Plaintiff points to the clause providing that if, after notice of termination for cause, it is determined that defendant's failure to perform "is due to causes beyond the control and without the fault or negligence" of defendant, the notice shall be deemed to have been issued pursuant to the clause entitled "Termination for Convenience of the Government." The latter clause provides that the contract may be terminated "whenever the contracting officer shall determine that such termination is in the best interests of the government," and that, in such event, the defendant shall "transfer title and deliver to the government * * * the fabricated or unfabricated parts, work in process, completed work, supplies, and other material produced as a part of, or acquired in connection with the performance of, the work terminated by the Notice of Termination, and * * * the completed or partially completed plans, drawings, information, and other property which, if the contract had been completed, would have been required to be furnished to the Government."
 
 
 35
 For the reasons above noted, the government, because of its breach which prevented performance by defendant, is in no position to ask enforcement of the title provision of the "Convenience" clause.
 
 
 36
 6. The "Changes" clause provides that "failure to agree to any adjustment shall be a dispute concerning a question of fact within the meaning of the clause entitled `Disputes.'" The "Disputes" clause provides that a dispute "shall be decided by the Contracting Officer"; that within 30 days the contractor may appeal to the Secretary of the Army or his duly authorized representative; that if no appeal is taken, "the decision of the Contracting Officer shall be final and conclusive"; that the Contractor is entitled to be heard and offer evidence in support of its appeal."
 
 
 37
 Defendant did whatever was necessary to protect its right of appeal to the Secretary of the Army: A week after termination of the contract by the Contracting Officer, it served upon the New York Ordnance District and upon the Secretary of the Army a notice of appeal from the decision of the Contracting Officer, pursuant to the "Disputes" clause. As the trial judge found: "It is not disputed that this appeal was served and that it was timely. Rule 4(c), promulgated by the Board of Contract Appeals, provides:
 
 
 38
 "`c. Trial briefs. Counsel for the government shall thereafter file with the Board a memorandum asserting the factual and legal issues which counsel for the government considers may be involved in a hearing upon the appeal. A copy of the memorandum shall be forwarded by counsel for the government to the contractor, who shall twenty days, or such longer time as the Board may allow in which to submit a reply memorandum. The case will thereafter be in order for hearing.' The evidence before me indicates clearly and is not disputed by the plaintiff that Lennox sought a review of the Contracting Officer's termination. The evidence further indicates and is not disputed by the plaintiff that nothing was done with respect to Rule 4(c). * * * The Contracting Officer, as Lennox aptly points out, made it impossible for the attorney for Lennox to prepare a memorandum asserting the factual and legal issues to be considered upon appeal and, this being so, if this constitutes the sole appeal procedure, then obviously in the instant action the appeal procedure was not only grossly inadequate but unavailable to the defendant because the Contracting Officer refused to make a record and simply sat and let time tick away."
 
 
 39
 7. Because of the nature of the government's breach, the trial judge correctly rejected the government's claim for money damages.
 
 
 40
 8. The following is the moral of this case: A Colonel may not deal with civilians as if they were soldiers subject to his command. In military service, subordinates must (within wide limits) obey the orders of their superiors, even if the orders be arbitrary. But when a military officer represents the government in carrying out a contract, he must recognize the restraints imposed by civil legal rules as to private dealings. If that were often forgotten, we would be on the way to militarizing civilian life, to the rule of the Commissars. Early in the 19th century, Tocqueville wrote: "I have often asked myself what would happen if, amid the relaxation of democratic manners, and as a consequence of the restless spirit of the army, a military government were ever to be founded among any of the nations of the present age. I think that even such a government would * * * retain none of the fierce characteristics of a military oligarchy. I am persuaded that, in such a case, a sort of fusion would take place between the habits of official men, and those of the military service. The administration would assume something of a military character, and the army some of the usages of the civil administration. The result would be a regular, clear, exact, and absolute system of government: the people would become the reflection of the army, and the community be drilled like a garrison."[49]
 
 II
 
 41
 Judges MEDINA and HINCKS would decide this case solely on another ground which we all agree is valid and dispositive.
 
 
 42
 We all think that the evidence fails to show a breach by the defendant. The defendant's non-performance was due to the action of the Government's contracting officer in issuing a notice of termination. No breach by the defendant having been shown, the Government may not recover damages. The only other relief sought is, essentially, the enforcement of an equitable lien on the defendant's property. Its right to enforce concededly depends upon a termination of the main contract. Clearly, as a suitor in equity the Government would be precluded from asserting a termination resulting from its own wrongful breach. But for purposes of this ground of affirmance we do not base our decision upon a breach of contract by the Government. Our disposition turns on the validity of the plaintiff's contention that by invoking the "termination for convenience" clause of the contract it has brought about a "termination" upon which its right to relief sought may be based.
 
 
 43
 It is true that the Government had a legal right to invoke that clause: it was not invalid. Doubtless it might be invoked to prevent accrual of further liabilities or as a valid defense to an action at law, — as, for instance, where the Government sued for damages consisting of costs of manufacture unnecessarily incurred after a notice of termination given because of a changed condition obviating the need for goods contracted for. But granted that the Government had a legal right to invoke the clause as a shield, it does not follow that by using the termination thus created as a sword it is entitled to enforce an equitable right. Its right to equitable relief may not be left to depend upon its own inequitable conduct. Here the notice of termination was expressly predicated upon the defendant's alleged inability to perform. In view of the fact that the "research team" of Government experts sent to investigate the defendant's ability to perform had shortly before made a report favorable to the defendant, we think the good faith of the contracting officer in terminating on the ground of inability was questionable. But that aside, if inability to perform existed when the notice of termination issued, the evidence makes it clear that it resulted in substantial part from the contracting officer's refusal at an earlier stage to use his conceded discretion to make larger partial payments. Even if the contract should not be so interpreted as to give the defendant a legal right to larger partial payments, we think that on the relevant evidence it was arbitrary and inequitable to refuse to make them especially since the defendant's need therefor was in substantial part attributable to successive change orders made by the Government. And so by reason of its own earlier inequitable conduct the Government is disentitled to the equitable relief which it now seeks. Especially is this so since to grant the relief here sought would be to enforce specific performance of a penalty clause in the contract. Moreover, although the Government has made partial payments in excess of the aggregate amount which it has already recouped, it is not entitled to the relief sought on the ground of unjust enrichment. This is so because (1) of its own inequitable conduct, and (2) it has not proved that the defendant will be enriched, unjustly or otherwise, if it is allowed to keep the property which the Government seeks to take. The defendant should not be so penalized merely because its opportunity to perform was prevented by circumstances beyond its control and by the manifest unfairness of the plaintiff. Such a penalty is repugnant to equity. See, e. g. Precision Instrument Mfg. Co. v. Automatic Co., 324 U.S. 806, 814-815, 65 S.Ct. 993, 89 L. Ed. 1381; United States v. Forness, 2 Cir., 125 F.2d 928, 940; Twyford v. Whitchurch, 10 Cir., 132 F.2d 819, 822; Frad v. Columbian National Life Ins. Co., 2 Cir., 191 F.2d 22, 26; Galvin v. Southern Hotel Corp., 4 Cir., 154 F.2d 970, 973.
 
 
 44
 We think that the proviso in the following recent enactment of Congress — 68 Stat. 81, 41 U.S.C.A. § 321 — though not directly involved here, lends further support to our position:
 
 
 45
 "Sec. 1. No provision of any contract entered into by the United States, relating to the finality or conclusiveness of any decision of the head of any department or agency or his duly authorized representative or board in a dispute involving a question arising under such contract, shall be pleaded in any suit now filed or to be filed as limiting judicial review of any such decision to cases where fraud by such official or his said representative or board is alleged: Provided, however, That any such decision shall be final and conclusive unless the same is fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence."
 
 
 46
 The Senate Report discloses that the Congressional purpose was to wipe out the ruling in United States v. Wunderlich, 342 U.S. 98, 72 S.Ct. 154, 96 L.Ed. 113, and to restore the views expressed in Ripley v. U. S., 223 U.S. 695, 701-702, 32 S.Ct. 352, 56 L.Ed. 614, i. e., that where the power of the government under a contract is complete and its agent's decision conclusive, then the government owes a corresponding duty to have its agent's judgment exercised reasonably, and not capriciously or in bad faith. In effect, Congress adopted the views of Justices Douglas and Jackson in their dissenting opinions in Wunderlich, 342 U.S. at pages 101-103, 72 S.Ct. 156-157.
 
 
 47
 True, the new statute, literally read, applies only to the "disputes" clause of a contract like that before us here. Congress, however, stated a general policy forbidding a government official to act capriciously in the exercise of a power of decision under such a contract. Such a policy should not be interpreted in a niggardly manner. See Van Beeck v. Sabine Towing Co., 300 U.S. 342, 350-351, 57 S.Ct. 452, 456, 81 L.Ed. 394; "It would be a misfortune if a narrow or grudging process of construction were to exemplify and perpetuate the very evils to be remedied. There are times when uncertain words are to be wrought into consistency and unity with a legislative policy which is itself a source of law, a new generative impulse transmitted to the legal system." In Gooch v. Oregon Short Line R. Co., 258 U.S. 22, 24, 42 S. Ct. 192, 193, 66 L.Ed. 443, the Court said: "For although courts sometimes have been slow to extend the effect of statutes modifying the common law beyond the direct operation of the words, it is obvious that a statute may indicate a change in the policy of the law, although it expresses that change only in the specific cases most likely to occur to the mind. Johnson v. U. S., 1 Cir., 163 F. 30, 32, 18 L.R.A.,N.S., 1194." See also Keifer & Keifer v. R. F. C., 306 U.S. 381, 391 and note 4, 59 S.Ct. 516, 83 L.Ed. 784; U. S. v. Hutcheson, 312 U.S. 219, 235, 61 S.Ct. 463, 85 L.Ed. 788; South & Central American Commercial Co. v. Panama R. Co., 237 N.Y. 287, 291, 142 N.E. 666; The Arizona v. Anelich, 298 U.S. 110, 123, 56 S.Ct. 707, 80 L.Ed. 1075; Warner v. Goltra, 293 U.S. 155, 157-159, 55 S.Ct. 46, 79 L.Ed. 254; Slifka v. Johnson, 2 Cir., 161 F.2d 467, 470; Stone, The Common Law in the United States, 50 Harv. Law Review 4, 13-14.
 
 
 48
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 "Changes
 "The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes, within the general scope of this contract, in any one or more of the following: (i) drawings, designs, or specifications, where the supplies to be furnished are to be specially manufactured for the Government in accordance therewith; (ii) method of shipment or packing; and (iii) place of delivery. If any such change causes an increase or decrease in the cost of, or the time required for, performance of this contract, an equitable adjustment shall be made in the contract price or delivery schedule, or both, and the contract shall be modified in writing accordingly. Any claim by the Contractor for adjustment under this clause must be asserted within 30 days from the date of receipt by the Contractor of the notification of change: Provided, however, That the Contracting Officer, if he decides that the facts justify such action, may receive and act upon any such claim asserted at any time prior to final payment under this contract. Failure to agree to any adjustment shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled `Disputes.' However, nothing in this clause shall excuse the Contractor from proceeding with the contract as changed.
 * * * * *
 "11. Default
 "(a) The Government may, subject to the provisions of paragraph (b) below, by written Notice of Default to the Contractor terminate the whole or any part of this contract in any one of the following circumstances:
 "(i) if the Contractor fails to make delivery of the supplies or to perform the services within the time specified herein or any extension thereof; or
 "(ii) if the Contractor fails to perform any of the other provisions of this contract, or so fails to make progress as to endanger performance of this contract in accordance with its terms, and in either of these two circumstances does not cure such failure within a period of 10 days (or such longer period as the Contracting Officer may authorize in writing) after receipt of notice from the Contracting Officer specifying such failure.
 * * * * *
 "(d) If this contract is terminated as provided in paragraph (a) of this clause, the Government, in addition to any other rights provided in this clause, may require the Contractor to transfer title and deliver to the Government, in the manner and to the extent directed by the Contracting Officer, (i) any completed supplies, and (ii) such partially completed supplies and materials, parts, tools, dies jigs, fixtures, plans, drawings, information, and contract rights (hereinafter called `manufacturing materials') as the Contractor has specifically produced or specifically acquired for the performance of such part of this contract as has been terminated; and the Contractor shall, upon direction of the Contracting Officer, protect and preserve property in possession of the Contractor in which the Government has an interest. The Government shall pay to the Contractor the contract price for completed supplies delivered to and accepted by the Government, and the amount agreed upon by the Contractor and the Contracting Officer for manufacturing materials delivered to and accepted by the Government and for the protection and preservation of property. Failure to agree shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled `Disputes.'
 "(e) If, after notice of termination of this contract under the provisions of paragraph (a) of this clause, it is determined that the failure to perform this contract is due to causes beyond the control and without the fault or negligence of the Contractor pursuant to the provisions of paragraph (b) of this clause, such Notice of Default shall be deemed to have been issued pursuant to the clause of this contract entitled `Termination for Convenience of the Government,' and the rights and obligations of the parties hereto shall in such event be governed by such clause.
 * * * * *
 "12. Disputes
 "Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall be final and conclusive: Provided, That if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer's decision."
 
 
 [2]
 
 "Partial Payments
 "Partial payments, which are hereby defined as payments prior to delivery, on work in progress for the Government under this contract, may be made upon the following terms and conditions.
 "(a) The Contracting Officer may, from time to time, authorize partial payments to the Contractor upon property acquired or produced by it for the performance of this contract: Provided, that such partial payments shall not exceed 75 per cent of the cost to the Contractor of the property upon which payment is made, which cost shall be determined from evidence submitted by the Contractor and which must be such as is satisfactory to the Contracting Officer: Provided further, that in no event shall the total of unliquidated partial payments (see (c) below) and of unliquidated advance payments if any, made under this contract, exceed 80 per cent of the total contract price of supplies still to be delivered.
 "(b) Upon the making of any partial payment under this contract, title to all parts, materials, inventories, work in process and nondurable tools theretofore acquired or produced by the Contractor for the performance of this contract, and property chargeable thereto under sound accounting practice, shall forthwith vest in the Government; and title to all like property thereafter acquired or produced by the Contractor for the performance of this contract and property chargeable thereto as aforesaid shall vest in the Government forthwith upon said acquisition or production: Provided, that nothing herein shall deprive the Contractor of any further partial or final payments due or to become due hereunder; or relieve the Contractor or the Government of any of their respective rights or obligations under this contract."
 
 
 [3]
 
 "Notice of Termination for Default
 
 
 [31]
 October 1952
Lennox Metal Manufacturing Company, Inc.,
60-02 596h Avenue,
Maspeth, Long Island, New York
 "1. Reference is made to your contract with the United States of America (hereafter referred to as `the Government'), bearing Contract No. DA-30-069-ORD 211, dated 14 June 1951, as amended to date, providing for the delivery of the following items, inter alia:
 Item Quantity Unit
 No. Description Unit Price Amount
 ----------------------------------------------------------
 1 Box, Ammunition 887,500 ea. $1.449 $1,282.70
 caliber .50 M2A1
 * * * * * * * * * * * * *
 "3. You have delivered a quantity of 141,676 units.
 "4. You have failed or refused to deliver a quantity of 745,824 units as required by the terms of your contract.
 "5. You have not undertaken, in a workmanlike and efficient manner, to comply within a reasonable time with requirements of Change Order `I' issued to you under date of 20 August 1952.
 "6. Lack of adequate financing to obtain raw materials and labor for performance of the contract and to comply with Change Order `I' does not constitute an `excusable delay' contemplated under Article II of your contract. * * *
 * * * * * * * * * * * * *
 "15. This notice constitutes a finding of fact pursuant to the Disputes Article in the General Provisions, Standard Form 32, which is a part of your contract, from which you have a right of appeal as specified therein."
 
 
 [4]
 Emphasis added
 
 
 [5]
 Emphasis added
 
 
 [6]
 Emphasis added
 
 
 [7]
 See, e. g., United States v. Moore, 95 U.S. 760, 763, 24 L.Ed. 588; United States v. Macdaniel, 7 Pet. 1, 14-15, 8 L.Ed. 587; United States v. Finnell, 185 U.S. 236, 243, 244, 22 S.Ct. 633, 46 L.Ed. 890; United States v. Sweet, 189 U.S. 471, 473, 23 S.Ct. 638, 47 L.Ed. 907; United States v. Johnston, 124 U.S. 236, 253, 8 S.Ct. 446, 31 L.Ed. 389; Hahn v. United States, 107 U.S. 402, 405-406, 2 S.Ct. 494, 27 L.Ed. 527; United States v. Philbrick, 120 U.S. 52, 59, 7 S.Ct. 413, 30 L.Ed. 559; Copper Queen Consol. Mining Co. v. Arizona Board, 206 U.S. 474, 479, 27 S.Ct. 695, 51 L.Ed. 1143; Logan v. Davis, 233 U.S. 613, 627, 34 S.Ct. 685, 58 L.Ed. 1121; cf. United States ex rel. Hirschberg v. Cooke, 336 U.S. 210, 216, 69 S.Ct. 530, 93 L.Ed. 621; United States v. American Trucking Association, 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345; Gray v. Powell, 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301; Billings v. Truesdell, 321 U.S. 542, 562-563, 64 S.Ct. 737, 88 L.Ed. 917; United States v. Minnesota, 270 U.S. 181, 46 S.Ct. 298, 70 L.Ed. 539; Swendig v. Washington Water Power Co., 265 U.S. 322, 331, 44 S.Ct. 496, 68 L.Ed. 1036; Kern River Co. v. United States, 257 U.S. 147, 154, 42 S.Ct. 60, 66 L.Ed. 175; United States v. Shreveport Grain & El. Co., 287 U.S. 77, 84, 53 S.Ct. 42, 77 L.Ed. 175; State of Wisconsin v. Illinois, 278 U.S. 367, 413, 49 S.Ct. 163, 73 L.Ed. 426
 
 
 [8]
 See, e. g., Supervisors v. United States, 4 Wall. 435, 445-446, 18 L.Ed. 419; Village of Kent v. United States, 6 Cir., 113 F. 232, 237; Davis v. City of New York, 2 Cir., 119 F.2d 559, 561; McMillan v. Barnard Free Skin & Cancer Hospital, 304 Mo. 635, 264 S.W. 410, 415; Carleno Coal Sales v. Ramsay Coal Co., Colo., 270 P.2d 755, 757; Empire Mills Co. v. Burrell, 18 Ga.App. 253, 89 S.E. 530; Lincoln National Life Ins. Co. v. Fischer, 235 Iowa 506, 17 N.W. 2d 273, 276-277
 
 
 [9]
 The "Partial Payments" clause contains a recital, "Whereas the parties hereto desire to amend the contract to provide forpartial payments to be made by the government." This clause was authorized by 32 C.F.R. 596.150-1, which, before setting forth the provisions of that clause, states, "In those cases where it is contemplated that partial payments in an amount not to exceed 75% of the cost to the contractor of the material used by the contractor in manufacturing the supplies or doing the work called for by the contract will be made, the contract will contain the following clause:" The Clause itself says, "Partial payments * * * may be made upon the following terms and conditions: (a) The Contracting Officer may, from time to time, authorize partial payments * * *, Provided, that such partial payments shall not exceed 75 percent * * *." (Emphasis added.)
 
 
 [10]
 Boro Hall Corp. v. General Motors Corp., 2 Cir., 164 F.2d 770, 772
 
 
 [11]
 Cf. Whiting Stoker Co. v. Chicago Stoker Co., 7 Cir., 171 F.2d 248, 250, 251
 
 
 [12]
 The following colloquy occurred at the trial:
 "The Court: Now you mean to tell me that if the government breached this contract, if it made it impossible for them to perform, that you still get your tools? In other words * * *, if you gave them $50 and then you cancelled the contract, you could get $200,000 worth of tools? Is that possible under that clause?
 "Mr. Flagg (government counsel): That is possible."
 
 
 [13]
 9 Wigmore, Evidence (3d Ed. 1940) 10, 37
 
 
 [14]
 Plucknett, A Concise History of the Common Law (4th Ed. 1948) 311. He is writing of interpretation of statutes
 
 
 [15]
 Paton, Jurisprudence (1945) 300
 
 
 [16]
 Paul Radin, Primitive Man as Philosopher (1927) 50-60 says: "Much if not all of the magical quality and potency possessed by the word is derived from its connection with the written script. That is quite intelligible. Granted a dynamic and ever-changing world, then the written word with its semi-permanence and its static character was a much desired oasis. * * * But culturally and psychologically it possessed even a greater significance, for it completed the victory of the visual-minded man over his competitors. From that time on, at least for the literate man, the main verities were the visual verities."
 
 
 [17]
 For these and numerous other instances where courts receive extrinsic evidence, see 3 Corbin, Contracts (1951) Sections 580, 582, 583, 586, 594
 
 
 [18]
 See 3 Corbin, Contracts (1951) 2, 13, 23: "Interpretation is the process whereby one person gives a meaning to the symbols of expression used by another person. * * * There is no single rule of interpretation of language, and there are no rules of interpretation taken all together, that will infallibly lead to the one correct understanding and meaning. In understanding the variable expressions of others, men must do the best they can and results must be determined even though correct understanding may be faulty." There is no "`one correct' meaning of an expression. * * * In reading each other's words, men certainly see through a glass darkly. * * * The best a judge can do is to put himself as far as possible in the position of the person or persons whose meaning and intention are in issue, knowing their history and experience and their relations with other men and things and then to determine what his own meaning and intention would have been. To do this requires a lively imagination, full and complete information obtained from the document and extrinsic testimony, and what we shall describe as sound judgment and common sense."
 The very word "interpretation" needs interpretation. Cf. Gutteridge, A Comparative View of the Interpretation of Statute Law, 8 Tulane L.Rev. 1 (1933).
 
 
 [19]
 See Frank, Some Tame Reflections on Some Wild Facts, in the volume Vision and Action (1953) 56, 61 ff
 
 
 [20]
 Cabell v. Markham, 2 Cir., 148 F.2d 737, 739. See also Cooke v. Vacuum Oil Co., 5 Cir., 63 F.2d 406
 
 
 [21]
 See translation of a portion of Ihering's Geist d. Rom. Recht, by W. G. Hammond in an Appendix to the 3d Ed. (1880) of Lieber, Hermeneutics, 262
 
 
 [22]
 Ullman, The Medieval Idea of Law as Represented by Lucas De Penna (1946) 21, 43, 113, 114
 
 
 [23]
 3 Corbin, Contracts (1951) 125
 
 
 [24]
 Burrows, Interpretation of Documents (1943) 4
 
 
 [25]
 The problem of the extent of the merging of text and context is also encountered in literary criticism, historical writing, philosophic thinking and elsewhere. See Frank, Some Tame Reflections on Some Wild Facts, in the volume Vision and Action (1953) 56, 65-69; Frank, Book Review, 25 Ind.L.J. (1950) 231
 Outside the courts, it is obvious that the seemingly clearest term may be variously understood. See, e. g., Sullivan, The Aspects of Science (2d series, (1926) 15-17) "Professor Rougier, in his `Paralogismes du Rationalisme,' instances the different significations so elementary and unambiguous a concept as a triangle has for different minds. He takes Euclid, Schopenhauer, Duns Scotus, Spinoza, and Goethe. For Euclid a triangle exists merely by definition, and its properties are the logical consequences of the primary axioms or postulates which have been assumed. Except in relation to these postulates it has no existence, and it signifies nothing whatever ever except what can be deduced logically from its definition. Schopenhauer takes the triangle as something `given'; it is, presumably, in some way `innate.' Its properties are to be discovered by experiment. Thus, of the properties Schopenhauer discovers he can only state that they exist; he cannot, like Euclid, show that they are necessary.
 "To Duns Scotus real knowledge of anything is a knowledge of its essence as belonging to the eternal order of the universe, as a necessary consequence of the perfection of God. He says: `To know the properties of a triangle by this participation in the divine, by the notion of the order of the universe, an expression of the perfection of God, is to know the properties of a triangle in a more noble manner than by the philosophic method.' To Duns Scotus the Euclidean conception of a triangle is superficial; to imagine the triangle exhausted by its definition is to miss its real significance; it is only when seen in its relation to the perfection of God that the `reality' of the triangle is grasped and that it can be said to be understood. This craving for a `deeper reality,' this tendency to see even the arbitrary creations of the mind as symptomatic of some cosmic principle, is by no means difficult to detect at the present day, although it seldom leads to the creation of so comprehensive and thorough-going a system as that of Duns Scotus.
 "The intuitive knowledge of Spinoza, his knowledge of the third kind or `clear knowledge,' is not unlike the `noble manner' of knowing of Duns Scotus. It is again knowledge which concerns the relations of the essence of a thing to the attributes of God. In the Farbenlehre of Goethe we have an example of a quite different way of apprehending a triangle, a way that Goethe himself calls mystical. To the mystic the triangle is not to be taken as a thing in itself, either as a mere definition or as a partial expression of the perfection of God; it is merely one embodiment of a principle of triangularity, just as, to the Pythagoreans, the number 8, the octave, love and friendship, harmony, are all expressions of the same thing. Logical relations, physical properties, moral qualities are all as it were, interchangeable on this view. Minds of this kind find analogies and resemblances where other minds can trace no connexion whatever. These instances by no means exhaust the methods of understanding the most simple and unambiguous phenomena. There are, for instance, the Hegelian understanding of notion as a manifestation of the dialectical process, and the Bergsonian method of `intellectual sympathy,' whereby the observer transports himself to the interior of the moving body."
 See Aristotle, On Sophistical Refutations, 165a, 10-12: "For names (i. e., words) are finite * * * while things are infinite in number. Inevitably, then, the same formulae, and a single name have a number of meanings."
 Cf. Montesquieu, Spirit of Laws, Bk. 29: "Laws which appear the same are sometimes very different."
 See Boston Sand & Gravel Co. v. U. S., 278 U.S. 41, 48, 49 S.Ct. 52, 73 L.Ed. 170. There the Court (per Holmes, J.) rejected the argument of the dissenting Justices that, in interpreting a statute, extrinsic evidence must never be considered unless the language is ambiguous on its face.
 
 
 [26]
 See the use of interpreters when a witness testifies in a foreign tongue. Wigmore, Evidence (3d ed.) Section 811
 Cf. Ross, The Education of Hyman Kaplan (1937) 7: "Who can tell us the meaning of vast?", asked Mr. Parkhill. Mr. Kaplan rose, radiant with joy. "`Vast!' Its commink from diraction. We have four diractions: de naut, de sot, de heast, and de vast."
 
 
 [27]
 3 Corbin, 84-86
 
 
 [28]
 Fox Film v. Springer, 273 N.Y. 434, 8 N.E.2d 23; Mencher v. Weiss, 306 N.Y. 1, 5, 114 N.E.2d 177
 
 
 [29]
 Marks v. Higgins, 2 Cir., 213 F.2d 884, 887; 52 Col.L.Rev. (1952) 125
 
 
 [30]
 See, e. g., Jackson, Problems of Statutory Interpretation, 1948, 8 F.R.D. 121
 
 
 [31]
 Powell, Construction of Written Instruments, 14 Ind.L.J. (1939) 199, 204-206; see discussion of that article in Prudence Bonds Corp. v. State Street Trust Co., 2 Cir., 202 F.2d 555 at pages 567-568 (dissenting opinion)
 
 
 [32]
 A contract has often been regarded as a private statute, made by the parties, governing their relations. See Aristotle, Rhetoric 1367b, 7-8: A "contract is a law, though of a special and limited kind." See also the French Civil Code, Sec. 1134; Lawson, The Rational Strength of English Law (1951) 56-57
 
 
 [33]
 For the judge, writes Wigmore, "to say that the evidence does not convince him, is proper enough. But for him to say that he will not listen to the evidence is a very different thing, both needless and contrary to all modern evidence." See Wigmore, Evidence, Students' Textbook (1935) 521
 
 
 [34]
 3 Corbin, 57, 58 note 65
 
 
 [35]
 3 Corbin, 66-67
 
 
 [36]
 3 Corbin, 128-130
 
 
 [37]
 Ibid. 72-73
 
 
 [38]
 Ibid. 76
 
 
 [39]
 Ibid. 78-80
 
 
 [40]
 Ibid. 250-251
 
 
 [41]
 Ibid. 45
 
 
 [42]
 See, e. g., 3 Corbin, Contracts (1951) 155-156; Aschenbrenner v. United States & Fidelity Guaranty Co., 292 U.S. 80, 84-85, 54 S.Ct. 590, 78 L.Ed. 1137; Texas & Pacific Ry. Co. v. Reiss, 183 U. S. 621, 626, 22 S.Ct. 253, 46 L.Ed. 358; Southern Ry. Co. v. Coca-Cola Bottling Co., 4 Cir., 145 F.2d 304, 307; New Prague Flouring Mill Co. v. Spears, 194 Iowa 417, 189 N.W. 815; Insurance Co. v. Slaughter, 12 Wall. 404, 407, 20 L.Ed. 444; 63 Harv.L.Rev. (1950) 494; Mellinkoff, How To Make Contracts Illegible, 5 Stamford L.Rev. (1953) 418
 Cf. "contracts of adhesion," i. e., resulting from a situation "where the energy of one party is confined to choosing whether to sign on the dotted line a contract dictated by the other." See, e. g., Paton, Jurisprudence (1946) 297; Kessler, Contracts of Adhesion, 43 Col. L.Rev. (1943) 629; Llewellyn, Book Review, 52 Harv.L.Rev. (1939) 700; Bekken v. Equitable Life Assur. Soc., 70 N.D. 122, 293 N.W. 200.
 
 
 [43]
 Elastic Stop Nut Corp. v. United States, 113 F.Supp. 446, 449, 126 Ct.Cl. 100
 
 
 [44]
 See, e. g., 3 Corbin, Contracts (1951) 54-56, 59, 257-259, 456-457; Wigmore, Evidence (3d Ed. 1940) Sec. 2417; Columbian National Life Ins. Co. v. Black, 10 Cir., 35 F.2d 571, 71 A.L.R. 128; Commercial Casualty Ins. Co. v. Lawhead, 4 Cir., 62 F.2d 928; Ohio Casualty Ins. Co. v. Callaway, 10 Cir., 134 F.2d 788; Murray v. Gadsden, 91 U.S. App.D.C. 38, 197 F.2d 194, 195, 201-202, 33 A.L.R.2d 554
 
 
 [45]
 See, e. g., 3 Corbin, Contracts (1951) (pages cited in preceding footnote); Wigmore, Evidence (3d Ed. 1940) Sec. 2416 (pp. 53-54); Broidy v. State Mutual Life Assur. Co., 2 Cir., 186 F. 2d 490; Prudential Ins. Co. of America v. Strickland, 6 Cir., 187 F.2d 67, 70; Kansas City Life Ins. Co. v. Cox, 6 Cir., 104 F.2d 321, 324; Electric Stop Nut Corp. v. United States, 113 F.Supp. 446, 449, 126 Ct.Cl. 100; Ohio Casualty Ins. Co. v. Callaway, 10 Cir., 134 F.2d 788; cf. Simmons Creek Coal Co. v. Doran, 142 U.S. 417, 435, 12 S.Ct. 239, 35 L.Ed. 1063
 
 
 [46]
 See, e. g., 3 Corbin, Contracts (1951) 472; United Fruit Co. v. United States, 1 Cir., 186 F.2d 890, 896
 
 
 [47]
 See, e. g., Vernon Lumber Corp. v. Harcen Const. Co., 2 Cir., 155 F.2d 348; Anderson v. Hershey, 6 Cir., 127 F.2d 884, 887; cf. Broidy v. State Mutual Life Assur. Co., 2 Cir., 186 F.2d 490, 496
 
 
 [48]
 It is not open to the government to contend that defendant acquiesced in the refusal of the government to pay the full 75%, since defendant diligently sought that amount
 
 
 [49]
 Tocqueville, Democracy in America, Second Part, Fourth Book, Chapter VI, note; emphasis added